IN RE INTEREST OF DIANE MARIE AND DAWN MICHELLE BRUNGARDT, CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. KATHY BRUNGARDT ET AL., APPELLANTS.

319 N.W.2d 109

Filed May 7, 1982. No. 44316.

Leonard Shefren of Shefren Law Offices, P.C., for appellant Kathy Brungardt.

Melvin C. Hansen of Hansen & Engles, P.C., for appellant Daniel Brungardt.

Donald L. Knowles, Douglas County Attorney, and Christopher E. Kelly, for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

HASTINGS, J.

This is an appeal by Kathy Brungardt and Daniel Brungardt from an order of the separate juvenile court of Douglas County terminating the parental rights of the natural mother, Kathy Brungardt, as to her minor children, Diane and Dawn, and the parental rights of the natural father, Daniel Brungardt, as to his minor child, Dawn. It had earlier been determined that Daniel was not the natural father of Diane. The appellants assign as error generally that the termination was not supported by clear and convincing evidence, and specifically that the court erred in not implementing less restrictive alternatives prior to terminating the respective parental rights.

Diane and Dawn are currently 4 and 3 years of age, respectively. Their birth dates are January 8, 1978, and January 30, 1979. A petition was filed on January 17, 1980, by the Douglas County attorney's office, alleging that the two girls came within the meaning of Neb. Rev. Stat. §§ 43-202(2)(b) and 43-209(2) (Reissue 1978), and requesting the termination of both parents' parental rights.

A detention hearing held on February 6, 1980, resulted in a finding by the court that the "children were seriously endangered in their surroundings." Consequently, the children were placed in the custody of the Douglas County Social Services for foster care placement. Following a May 15, 1980, adjudication hearing, the court found that each child fell within the meaning of §§ 43-202(2)(b) and 43-209(2) with regard to each girl's natural parents. The appellants' parental rights were taken under advisement.

A disposition hearing was held on July 1, 1980, at which time several reports from various social agencies were introduced into evidence. The court issued the following order in response to these reports: That Kathy undergo psychological and psychiatric evaluation and therapy; that Daniel con-

sent to the release of his report from the Hastings Regional Center; that both parents attend parenting classes; that both parents maintain full-time employment and adequate housing; that each visit the girls regularly; and that each cooperate with the various social services in completing a rehabilitation plan. Kathy was also to receive extended visitation rights after she had attended two parenting classes.

At a review hearing on September 3, 1980, the court received various reports outlining the results of the testing and evaluation it had ordered on July 1. In addition, it received reports from two social service workers reporting on the progress made by the parents since July 1, 1980. These latter two reports contained the recommendation that the children remain in the custody of the Douglas County Social Services, with a continuation of the extended visits earlier granted to Kathy. The court also received a recommendation from its own service officer to the effect that the children be placed in the mother's custody. The court followed this latter recommendation and placed the girls in the custody of the mother and ordered the mother to continue with her rehabilitation program.

The children were returned to the custody of the Douglas County Social Services following a September 18th incident, and a detention hearing was held on October 1, 1980. A final hearing on this matter was held on March 11, 1981, at which time the court determined that Daniel and Kathy had failed to demonstrate "that the causes of the neglect and abuse apparent from 1978 to today's date have abated, but rather that the peculiar personality traits which led to the neglect and abuse have deepened and hardened." Therefore, the court concluded that "long term foster care . . . would be totally inappropriate" in this instance and terminated the rights of both parents, pursuant to § 43-209(2).

The evidence adduced at these numerous hearings concerning the father revealed a long history of drug use and abuse and some dealing, a history of Daniel physically abusing Kathy, and reports of one instance where Daniel inadvertently struck Diane and of another instance where he slapped Diane "very hard" for crying. The evidence also revealed that Daniel made very little progress during the efforts at rehabilitation. In August 1980 he moved to Denver, Colorado, where he was infrequently employed and was reportedly discovered by Kathy to be using and dealing in drugs while living with two other men, a woman, and two children. The record also indicates that Daniel failed to make bimonthly support payments as ordered by the court, but did in fact make one lump sum payment on March 3, 1981. Daniel's visit with the girls, other than on the date of the final hearing, occurred in July 1980. Daniel's principal excuse for failing to visit the children and for not meeting the support payments was a lack of money caused by his inability to work due to injuries suffered in an October 4, 1980, accident. Finally, the record reveals that Daniel failed to participate in any parenting classes while in Colorado because, in his own words, "I feel that I treat my children right."

The record is somewhat more severe in what it reveals about Kathy and her treatment of the children. It contains the testimony of three witnesses who either observed or heard Kathy strike or verbally abuse Dawn or Diane. One of these occasions left a visible handprint and scratch on Dawn's face. The final instance involved an incident occurring on September 18, 1980, when, according to the testimony of the witness, Kathy struck Dawn in the face and about the body, kicked her with such force as to cause her to fall and strike her head on the floor, and finally threw the child back onto the couch after she had rolled off of it. After this latter incident,

Dawn stopped breathing for a short period and was taken to the hospital by Kathy for treatment. The treating physician termed Dawn's injuries, a bruised forehead and small abrasion, as not serious and was unable to say whether they resulted from child abuse. Another physician testified that the events as described by the witness met the definition of child abuse and that the cessation of breathing could result from a blow to the head. While Kathy admitted that she did hit the children at times, she denied ever having beaten them and flatly denied that the September 18, 1980, incident occurred as the witness described. No explanation was offered as to why these other witnesses would lie about the beatings.

The record also reveals that Kathy made a misrepresentation of fact to the court on at least one occasion when the court was allowed to proceed under the impression that Kathy was living in an apartment on September 3, 1980, when it returned the children to the mother's physical custody. The actual circumstances were that Kathy had been evicted from her apartment the morning of the hearing and had planned to reside with Daniel's parents after receiving custody of the children. This in part led the court to conclude that "Kathy distorts the truth whenever it suits her purposes and it becomes very difficult for the Court to glean truth from Kathy's statements about her ability to ever adequately parent her children."

The evidence and testimony make it apparent that Kathy was making a minimal effort to rehabilitate herself prior to September 18, 1980. She presented herself for evaluation by a psychologist and a psychiatrist as ordered by the court on July 1, 1980, although the reports of the psychologist spoke of her "angry hostility" during the interview and the psychiatrist noted the difficulty Kathy had trusting other people. It is also obvious that prior to the

September 18, 1980, incident, Kathy was uncooperative with the social service workers with whom she had to deal. While Kathy was inconsistent with her visits to the children prior to the July 1 hearing, she eventually did visit them regularly and was even able to take them on two extended overnight visits prior to regaining custody of them on September 3, 1980.

According to the social workers, this minimal effort was significantly altered by the September 18, 1980, incident. Thereafter, the social services caseworkers noted a change in Kathy's attitude. Since the incident, Kathy was able to obtain her G.E.D. certificate, was receiving therapy from the Nebraska Psychiatric Institute, was attending parenting classes, and was employed as a waitress. Kathy's positive parenting counselor testified that Kathy was making a good effort at improving her parenting skills, although she was not sure Kathy could apply these skills in raising her children. A caseworker noted that the children appeared to be a little more excited about seeing their mother during visitations than they had been earlier.

The social workers also commented on Kathy's emergence from the "self-denial stage," a stage during which she could not admit that her actions had caused problems for the children. One caseworker noted that a week after Dawn was taken to the hospital Kathy was able to say to her that she knew that what she had done was wrong and that she had hurt her child. However, on the witness stand during the March 11, 1981, hearing, Kathy denied having struck Dawn in the manner described by the witness, and proceeded to place the blame for all of her problems on Daniel and his family. Therefore, one must question whether Kathy had fully emerged from the "self-denial stage."

In spite of all the improvement the caseworkers had noticed in Kathy, neither was able to make a rec-

ommendation as to what course of action the court should have adopted concerning Kathy's parental rights. One caseworker even admitted that she was unsure whether Kathy could be rehabilitated. However, another caseworker felt that there would be no harm in preserving Kathy's parental rights and allowing bimonthly visitations. Based on the somewhat equivocal opinions given by the social workers, the guardian ad litem said, "I have trouble recommending termination at this time with Kathy."

With regard to the parental rights of Daniel, the court found that the "evidence convincingly shows continued deterioration in his stability, which implies that at no time in the foreseeable future would Daniel be able to adequately parent the children in interest." Consequently, the court terminated Daniel's parental rights in Dawn Michelle Brungardt. In addressing the evidence against Kathy, the court noted Kathy's "mistreatment" of the children. The court also placed much emphasis on the fact that Kathy had led the court to believe that she was prepared to receive custody of the children on September 3, 1980, when only 15 days later she inflicted sufficient harm to Dawn to require hospitalization. Feeling that it would "not [be] justified in risking the health and welfare of the children in interest," the court terminated Kathy's parental rights in both children. Both parents have appealed.

We note that an appeal from an order terminating parental rights requires a de novo review and that an order under § 43-209 must be based on clear and convincing evidence. The State may not deprive a parent of the custody of a minor child unless it is affirmatively shown that such parent is unfit to perform the duties imposed by the relationship or has forfeited that right. *In re Interest of Stoppkotte,* 210 Neb. 1, 312 N.W.2d 454 (1981). We must emphasize that " '[t]he right of a parent to custody and control of his [or her] child is a natural, but not an

inalienable, right. The public has a paramount interest in the protection of children from abuse and neglect.' '' *In re Interest of Wood and Linden,* 209 Neb. 18, 24, 306 N.W.2d 151, 155 (1981).

A review of the record makes it obvious that the order terminating Daniel's parental rights was supported by clear and convincing evidence. His inability to secure and maintain employment, his use and abuse of drugs, and his propensity to physical violence all indicate to a sufficient degree that he is an unfit parent and that the best interests of the children, which are the primary concern of the courts in these cases, are best served by the termination of Daniel Brungardt's parental rights.

The question raised by Mr. Brungardt regarding the court's failure to use less restrictive means of dealing with the issue has recently been addressed by this court. We have noted that "it is not the law in this state . . . that 'parental rights may not be terminated unless the parent is given a reasonable opportunity to rehabilitate himself.' '' A court may, however, within its discretion, order a parent to make reasonable efforts to rehabilitate, and "failure of those efforts is another independent reason justifying termination of parental rights." *In re Interest of Wood and Linden,* supra at 23-24, 306 N.W.2d at 154. See § 43-209(6). Furthermore, "when natural parents cannot rehabilitate themselves within a reasonable time after the adjudication hearing, the best interests of the child or children require that a final disposition be made without delay." *In re Interest of Stoppkotte,* supra at 7, 312 N.W.2d at 457.

In the present action, the juvenile court, even though it was not required to do so, gave Mr. Brungardt ample time to rehabilitate himself. He expended very little, if any, effort in an attempt to do so in the year and 2 months following the filing of the petition by the county attorney. It has been established by clear and convincing evidence that Mr.

Brungardt has continuously and repeatedly neglected his natural child, Dawn, and has failed to give the child the necessary parental care and protection. Therefore, the best interests of the child are served by the termination of Mr. Brungardt's parental rights, and we affirm the juvenile court's order doing so.

The circumstances surrounding Mrs. Brungardt's situation present a more complex problem. While it is quite apparent that she made little effort to rehabilitate herself prior to the September 18, 1980, incident, the evidence is uncontroverted that her attitude changed significantly thereafter. Mrs. Brungardt received her G.E.D. certificate, was undergoing psychiatric therapy, was attending parenting classes in an attempt to improve her parenting skills, and had secured employment as a waitress. All of these efforts apparently had some impact on the children as well, since it was reported that they were a little more excited about seeing their mother during visitations than they had been earlier.

We have made it clear in the past that termination of parental rights is indeed a last resort and should be implemented only when no other reasonable alternative exists. *In re Interest of Hill,* 207 Neb. 233, 298 N.W.2d 143 (1980); *In re Interest of Holley,* 209 Neb. 437, 308 N.W.2d 341 (1981). However, as we have said earlier, when the natural parents cannot rehabilitate themselves within a reasonable time, the best interests of the children require that a final disposition be made without delay. *Stoppkotte, supra.* Although termination of parental rights may not be decreed for the sole purpose of facilitating adoption, nevertheless, children have a right to grow up in a safe and healthy environment. Each day's delay in making them available for permanent placement in such surroundings causes such right to become increasingly unobtainable. *In re Interest of Carlson,* 207 Neb. 540, 299 N.W.2d 760 (1980).

Although our review is de novo, as indicated earlier, nevertheless, we have held that "findings of fact by the trial court will be accorded great weight because the trial court heard and observed the parties and witnesses." *In re Interest of Chirnside,* 209 Neb. 750, 757, 311 N.W.2d 876, 879 (1981). To that extent, we are entitled to place some reliance upon the findings made by the trial court in its comments at the close of the final hearing: "There was a finding that the children shouldn't be placed in their home or in the home of either one for a time. Upon the sincerity demonstrated by Kathy Brungardt and on the recommendation of other agency personnel, the children were replaced with her. Two weeks later one of the children was hospitalized, had stopped breathing. And when you're talking about stopping breathing, in my opinion, you're discussing something that's very close to death. And that was Kathy Brungardt's obvious fear from her testimony. And what I have to weigh is whether I want to put those children in a situation where that possibly could happen again. Because I have the same sincerity before me today of Kathy Brungardt. She always seems to do quite well when the children are not with her and makes substantial strides. But as we saw two weeks after they were placed back with her, one child was traumatized, injured, and in this Court's opinion, there was no question but that Maureen McClintock was telling the truth as she knew it. And the obvious inference from that is that Kathy Brungardt was lying when she testified on the witness stand just as she has lied . . . on September 3rd."

In view of her past performance, we do not believe that Kathy should ever be allowed to be alone with these children. The record does not support a finding that she has made any appreciable improvement in her ability to safely care for these children. To the contrary, it suggests that she still refuses to face

reality and insists on now denying facts she once admitted.

In our opinion, the record supports by clear and convincing evidence the judgment of the separate juvenile court in terminating the parental rights of both parents. Its judgment is affirmed.

AFFIRMED.

KRIVOSHA, C.J., dissenting.

I find that I must respectfully dissent from the majority's opinion in this case. The record discloses that just at the time when the mother appears to be making the progress which we would hope she would make, we terminate her parental rights. As noted by the majority, since September 18, 1980, the mother's attitude has noticeably changed. She has obtained her G.E.D. certificate and was receiving therapy from the Nebraska Psychiatric Institute. Moreover, she is attending parenting classes and is employed as a waitress. Her positive parenting counselor testified that she was making a good effort at improving her parenting skills, although she was not sure that she could apply these skills in raising her children. The caseworker noted that the children appeared to be a little more excited about seeing their mother during visitations than they had been earlier. Even the guardian ad litem said that he had trouble recommending termination at this time.

The majority notes that the termination of parental rights should be a last resort that should be implemented only when no other reasonable alternative exists, citing *In re Interest of Hill,* 207 Neb. 233, 298 N.W.2d 143 (1980), and *In re Interest of Holley,* 209 Neb. 437, 308 N.W.2d 341 (1981). Because I agree with that proposition of law, I do not believe that this record clearly and convincingly establishes that termination is the only reasonable alternative remaining. I would have reversed the trial court's order terminating the parental rights of the children

as to the mother and would have continued the program of rehabilitation under court supervision. Once the parental rights of the mother are not terminated, little purpose is served in terminating the rights of the father. For that reason, I would have reversed and remanded this case so as to continue the children in supervised foster care, with the expectation that the mother's behavior would continue to improve, as it was improving, and that ultimately the children could be returned to their mother. If that did not prove out, there would still be time to terminate the parental rights.