340 N.W.2d 415 (1983)
215 Neb. 724
In re Interest of R.D.J. and K.S.J., children under 18 years of age.
STATE of Nebraska, Appellee,
v.
O.J. et al., Appellants.
No. 83-272.
Supreme Court of Nebraska.
November 18, 1983.
*416 Gerald D. Warren of Whitney, Newman, Mersch & Otto, Aurora, for appellants.
Michael J. Owens, Hamilton County Atty., Aurora, for appellee.
Michael Powell, Aurora, guardian ad litem.
KRIVOSHA, C.J., and BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.
WHITE, Justice.
On November 6, 1980, the county attorney of Hamilton County, Nebraska, acting on behalf of and in the name of the State of Nebraska, filed petitions in the juvenile division of the county court, Hamilton County, involving R.D.J. and K.S.J. The petitions as amended by stipulation allege that K.S.J. is a female child born April 9, 1979, that R.D.J. is a male child born October 27, 1976, and that both children either lacked proper parental care by reason of the fault of their parents or they were children whose parents neglected or refused to provide proper or necessary care. Neb.Rev. Stat. § 43-202(2)(b) and (c) (Reissue 1978). Both subsections (2)(b) and (c) of the above statute were repealed by 1981 Neb.Laws, L.B. 346, but the identical language relating to the subsections is now incorporated within Neb.Rev.Stat. § 43-247(3)(a) (Cum.Supp. 1982). After an adjudicatory hearing on December 16, 1980, the county court declared the children to be within the meaning of § 43-202(2)(c). Temporary legal custody was placed in the Hamilton County Division of Public Welfare, with physical custody remaining with the parents. The county welfare division was ordered to provide the parents with intensive homemaking services and supervision, and budgetary and nutritional training.
In June 1979 K.S.J. was hospitalized for a period of 12 days. Initial diagnosis was "failure to thrive" syndrome. Upon further observation the child was found to be seriously underweight, dehydrated, possessed of what is characterized as a very severe diaper rash, and to have a distended stomach. During the hospital stay, the child immediately gained weight and seemed to improve in all appearances. The diaper rash was eliminated.
At the request of the treating physician, a nurse was asked to periodically visit the parents' home, in which the two children resided. It was on these visits, coupled with the county welfare department visits that began in April 1978, that the conditions giving rise to the filing of the petitions were discovered. As is common with a number of cases recently brought before this court, the home conditions could best be described as atrocious, not merely disordered and cluttered. The house was described as filled with filth, dog and cat feces, clutter, and garbage. K.S.J. and R.D.J. were soaked with urine and feces; the house stank; inadequate food and further evidence of total and complete disregard for the most elementary rules of sanitation and child care were observed.
*417 It is not necessary to recite in detail the heroic efforts made by the various welfare departments in attempting to educate the parents and upgrade their standard of housekeeping to even a minimal level. Over the period of time until the date of termination in August 1982, approximately 400 home visits were made by various state agencies. Extended instructions were given to the parents in such elementary subjects as bathing children, washing clothes, and sweeping and vacuuming floors; for each temporary gain there would be a setback which brought the home situation back to an identical condition or worse than was first encountered by the visiting agencies. Appellants' counsel suggests, based on some rather loose testimony and a few statements in an enormous record, that the parents were, in fact, feeding their children; the evidence is clear and convincing, however, that substantial difficulty was encountered in seeing that a reasonable diet was given the children, even during the time of the extraordinary home visitations by the welfare services.
The county court conducted periodic review hearings, and in April 1981 K.S.J. was removed from the home. She has been in foster care since that time. R.D.J. remained in the home under constant supervision of the welfare agency, except for a short period of time in 1982 when the child was placed in foster care. Extensive psychological evaluations were made of both the parents and the children. Significant is the fact that in addition to the intellectual capabilities of the parents, ranging from borderline mentally retarded to low-average intellectual ability, is the finding of the psychologist that the emotional difficulties suffered by the parents, involving rigidity, result in a failure to change lifetime patterns and a stubborn return to previous habits, in spite of extended instructions and urgings. Significant also were the psychological evaluations introduced at the hearing on motion to terminate in August 1982, comparing the progress of K.S.J. and R.D.J. K.S.J., who was removed from the home in April 1981, was shown by all batteries of tests to have advanced significantly in verbal and motor skills during the period of her foster care, while R.D.J., who had remained, except for a short time, in the home of the parents, actually regressed considering the increase in age.
There is no dispute in the evidence, or really any hope from the record, that the parents are now or will ever be capable of managing children of any age. The most that could be hoped for if they were to regain custody would be that the children would survive until such time as they could fend for themselves.
A more difficult issue presents itself in the comments of this court in the recent case of In re Interest of Spradlin, 214 Neb. 834, 841, 336 N.W.2d 563, 567 (1983), which are pertinent here. "[T]he juvenile court patiently delayed its decision regarding termination for a relatively lengthy period of time in order to allow the appellants to attempt to effectuate their plan. Such plan proved to be an utter failure, and the court accordingly proceeded to enforce its prior determination, which resulted in termination of appellants' parental rights.
"The evidence clearly and convincingly establishes that appellants herein are simply incapable of caring for the child, even in the best of settings, wherein they were provided live-in household assistance. It is indeed unfortunate that appellants do not have the ability to function adequately as parents; but, as much as one's sympathies may rest with appellants by virtue of that unfortunate reality, the State cannot stand idly by oblivious to the welfare of an infant or heedless of the fact that its failure to intervene, should the child survive, would likely result in producing yet another individual incapable of coping with life."
We are conscious in reviewing these matters that we proceed to hear them de novo on the record and that the decision to terminate parental rights must be supported by clear and convincing evidence. In re Interest of Fant, 214 Neb. 692, 335 N.W.2d 314 (1983); In re Interest of Biesecker, 214 Neb. 425, 333 N.W.2d 923 (1983);
*418 In re Interest of Levey, 211 Neb. 66, 317 N.W.2d 760 (1982).
Unlike a number of the cases in which deliberate parental misconduct has been present, this is not such a case. We are convinced, as asserted by appellants' counsel, that the parents do indeed love their children. We are indeed convinced, as counsel has suggested, that given adequate parental supervision the children might survive, but we are also convinced that the psychological damage to the children due to the emotionally deprived situation of the parents' home would be utterly devastating. As we said in State v. Souza-Spittler, 204 Neb. 503, 511, 283 N.W.2d 48, 52 (1979): "`[W]e will not gamble with the child's future; she cannot be made to await uncertain parental maturity.'"
The judgment of the District Court, which affirmed the decision of the county court terminating the parental rights of the parents to R.D.J. and K.S.J., is hereby affirmed.
AFFIRMED.