IN RE INTEREST OF D., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. L.J.D. ET AL., APPELLANTS.

352 N.W.2d 566

Filed July 20, 1984.   No. 83-583.

Richard C. Anderson, for appellants.

Gerald R. Jorgensen, Deputy Buffalo County Attorney, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

SHANAHAN, J.

The county court for Buffalo County, sitting as a juvenile court, terminated the parental rights of the father and mother to their minor child, and the parents appealed to the district court, which affirmed. This appeal followed, and we affirm.

The father and mother were married on November 17, 1979. They first arrived in Kearney, Nebraska, in late August 1980. Approximately 1 month later, on September 21, 1980, the child was born and the family moved in with friends. That living arrangement continued until December 11, 1980, when the parents in these proceedings and their child moved. Because the parents were unable to provide immediate housing for themselves and their child, the parents voluntarily placed the child with the Buffalo County Department of Social Services for temporary foster care. On December 19, 1980, a juvenile petition was filed, alleging that the child was as described in subsections (1) and (2) of Neb. Rev. Stat. § 43-202 (Reissue 1978).

On January 7, 1981, a hearing was held at which the parents admitted that their child was a child as described in § 43-202(1), namely, that the child was "homeless or destitute, or without proper support through no fault of his parent . . . ." Cf. Neb. Rev. Stat. § 43-247 (Cum. Supp. 1982) (substantially similar language). Upon the evidence the county court made an adjudication determining the child to be as described in § 43-202(1), and ordered a plan of parental rehabilitation, namely, the child could be returned to the parents' home on condition that the parents (1) showed employment stability, (2) provided a suitable and stable home environment, (3) demonstrated financial and physical abilities to care for the child, and (4) cooperated in all programs required by the county department of social services.

Physical custody of the child was transferred from the county department of social services to the parents on February 14, 1981. The department of social services continued supervision of the child and his parents. The parents were required to keep doctors' appointments, receive psychological evaluations, cooperate with a homemaker from the welfare department in order to improve their home environment, and maintain an adequate living environment for the child. By mid-March 1981 the father had no steady employment, and failed to cooperate in the programs offered and required by the welfare department. The child developed a severe diaper rash which was brought to the attention of a physician only after intervention by the welfare department's homemaker. Although medicine for the child's diaper rash was obtained once, the parents did not refill

the required prescription to alleviate the child's rash, notwithstanding that the parents found money to purchase approximately two packs of cigarettes each day.

Before any further intervention by the court, and in violation of a January 7, 1981, court order forbidding removal of the child from the court's jurisdiction, the parents took their child to Florida. Felony charges of an unspecified nature were filed against the parents for removing their child from Nebraska. The parents were returned to Nebraska from Florida through extradition proceedings in the late summer or early fall of 1981. In September 1981 the child was returned to Nebraska and placed in renewed foster care. In Nebraska the parents' efforts to take advantage of rehabilitative services afforded by the welfare department were sporadic. The rehabilitation program had little or no success. The mother visited the child twice from the fall of 1981 to February 1982, while the father visited the child only once during that period.

On February 2, 1982, a review hearing was held, and the court ordered a definite rehabilitation program for the parents. This program required the parents to (1) secure and maintain full-time employment; (2) locate suitable housing; (3) participate in and complete the following specific programs: (a) classes designed to improve skills for the care and management of children, (b) alcohol treatment, and (c) marital counseling; (4) follow terms and directions of their felony probations; and (5) cooperate with the department of welfare and the services of its homemaker. The parents were allowed reasonable visitation of their child during such proposed program.

The father had a severe alcohol problem. However, because he believed he could control his alcoholism without outside help, the father exhibited limited participation in the county's counseling services and discontinued Antabuse prescribed as part of the father's treatment for alcoholism and rehabilitation. The only requirement regarding parenting classes was the physical presence of the parents at 7 of 10 class sessions. The mother completed the parenting classes, but the father did not. Marital counseling at the South Central Community Mental Health Services was terminated when the parents failed to pay a $1 per session fee for eight sessions. According to the father,

there were several months that he could have paid the total back fees of $8, but the father acknowledged nonpayment because he did not care to continue counseling. Throughout this time, the father's employment was still sporadic, and the mother forgot several appointments with the county's homemaker. The family fell in arrears in rent and were forced to move again.

In December 1982 the Buffalo County attorney's office requested a dispositional hearing for the termination of parental rights. The dispositional hearing was held on January 21 and February 2, 1983. After receiving evidence the county court entered an order terminating the parental rights of the appellant parents. That order was affirmed on appeal to the district court.

The parents contend the evidence before the court was insufficient to support termination of parental rights.

"In an appeal of a juvenile case, including termination of parental rights, we review the record de novo, and regarding disputed facts make our own findings independent of any conclusion reached by the trial court." *In re Interest of W.*, 217 Neb. 325, 329, 348 N.W.2d 861, 864 (1984); cf., *State v. Kinkner*, 191 Neb. 367, 216 N.W.2d 165 (1974); *State v. Rice*, 204 Neb. 732, 285 N.W.2d 223 (1979); *In re Interest of Brungardt*, 211 Neb. 519, 319 N.W.2d 109 (1982); *In re Interest of Roman*, 212 Neb. 919, 327 N.W.2d 36 (1982).

The county's homemaker informed the parents of hygiene, nutrition, meal planning, and general child care. According to the homemaker, the goal of her efforts is "to help people to learn how to take care of their home so they can take care of their children and have their children." The child was in the physical custody of his parents from February 14 through August 5, 1981, when the family moved to Florida. Despite her efforts over this 6-month period, the county's homemaker saw no improvement in parental skills. During that same 6-month period, the homemaker on occasions observed the following: unavailability of clean diapers for the child; four bags of trash simultaneously in the kitchen, and bags of soiled clothing; "a chicken bone"; "dirt, baby food jar lids, cigarette butts"; potentially dangerous tools accessible on the floor; and rotting fish bait (dead minnows) in the kitchen sink. In July and August

of 1981, notwithstanding 6 months' contact with the county's homemaker, and when the 11-month-old child was in a walker, the homemaker observed that the child could come in contact with "wet newspapers on the floor from the dogs going to the bathroom," and feces of dogs and cats. In addition, the house was beset with an infestation of flies due to large holes in the screens admitting cats from out of doors. Cats ate on the kitchen table in the family's house.

The mother obtained employment at a local motel on August 8, 1982, and retained that employment through the termination hearing in February 1983. However, the father's employment remained inconsistent, in the form of three jobs separated by varying lengths of unemployment, with full-time employment just 5 weeks before the termination hearing.

From October 1982 to January 1983 both parents were available for appointments and consultation with the caseworker until approximately 3 p.m. on weekdays. Before the parents commenced visitation of their child, the welfare department's caseworker frequently requested that the parents visit her office in the courthouse for familiarization about the visitation conditions in the court-ordered rehabilitation. Despite these repeated requests, the parents never made an appointment with the caseworker. The mother explained that she had attempted to make an appointment but was either working or did not have transportation to the courthouse office of the caseworker. When transportation was not available, the mother walked to the courthouse, where the department of welfare office was located, and picked up her food stamps and welfare checks. Neither parent missed any weekday appointment with their probation officer, whose office was also located in the county courthouse.

From the record we conclude that the parents were not interested in maintaining contact with their minor child and were not interested in taking advantage of the rehabilitation programs offered by the welfare department. The assignment of error that there is insufficient evidence to sustain termination of parental rights is without merit.

The parents next maintain that the county court, sitting as a juvenile court, erred in finding that the best interests of the

minor child would be served by terminating their parental rights.

The primary consideration in any case involving termination of parental rights is the best interests of the child. See *In re Interest of Levey*, 211 Neb. 66, 317 N.W.2d 760 (1982).

During two visitations, one in October and one in December of 1982, the caseworker had difficulties in separating the child from his foster parents. The child, when asked to leave the home of the foster parents with the caseworker, would cry, scream, and cling to the foster parents. According to the caseworker, in December 1982 "it took us probably 15 or 20 minutes to try to work him through it and could not and finally kind of just bodily carried him out to the car with me." The child had developed a sound, affectionate relationship with his foster parents and exhibited only minimal emotional attachment to his natural parents. When he was asked to return to his foster parents after parental visitation, the child "immediately put on his coat and left" with the caseworker without any problem.

As all too frequently occurs in cases such as the one before us, the enthusiasm or receptivity of a parent toward a rehabilitation program seems to intensify as the time for a dispositional hearing approaches. A practical program of parental rehabilitation should not be viewed as our system's indulgent toleration of an otherwise intolerable situation. A parent afforded a program of rehabilitation must realize that the courts will examine a pattern of parental conduct in determining an appropriate disposition for the best interests of a child. In cases such as this the past is an indication of the future. Failure of a parent's good faith effort toward rehabilitation to correct a situation injurious to the life and normal development of a child may cause a court to conclude that a parent's past offers no future for the child.

The child is currently almost 4 years old. With the exception of 9 months with his parents, the child has spent his entire life in foster care. During this time, the parents have failed to take advantage of the efforts of the court and support services to restore the child to the family home. It weighs heavily in our minds that the parents have generally failed and neglected to take advantage of opportunities to visit their child. To now

leave the child in foster care for an indefinite period would be patently unfair to him, and would only continue the emotional problems attendant to a "temporary" custody situation. A child cannot be left suspended in foster care, and should not be required to exist in a wholly inadequate home. Further, a child cannot be made to await uncertain parental maturity. As we said in *In re Interest of R.D.J. and K.S.J.*, 215 Neb. 724, 728, 340 N.W.2d 415, 418 (1983): " ' "[W]e will not gamble with the child's future." ' " In our system of law directed toward the best interests of a juvenile, termination of parental rights is not a penalty imposed on account of poverty. Parental inability to reach heights of economic success is no basis to sever the precious relationship which normally exists between parent and child. However, that same system of laws pertaining to juveniles cannot reward parental bankruptcy evidenced by indifference or inexcusable lethargy adversely affecting the life and living conditions demanded by a child's personal dignity. The assignment of error that termination of parental rights is not in the best interests of the child is without merit.

The judgment of the district court is affirmed.

AFFIRMED.

KRIVOSHA, C.J., dissenting.

For reasons more particularly set out in my recent dissent in *In re Interest of D.R. and S.B.*, 217 Neb. 883, 351 N.W.2d 424 (1984), I find that I must likewise dissent in this case. I again believe that the record simply does not establish "by clear and convincing evidence" that the parental rights of the parties here should be terminated. It is ironic, because the record would seem to imply that if the parents had not voluntarily placed the child with the Buffalo County Department of Social Services for temporary foster care in December of 1980, the State might not have taken any action with regard to this case. Obviously, the child is not comfortable with the natural parents, having been away for so long. That is a matter, however, which I believe time would correct. I believe that we should not have terminated the parental rights in this case.