IN RE INTEREST OF S. W., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. K. W., APPELLANT.
371 N.W.2d 726

Filed August 9, 1985.   No. 84-851.

Dennis T. Chapman, for appellant.

Donald L. Knowles, Douglas County Attorney, and Douglas D. Grieser, for appellee.

Maureen Fitzgerald Brown, guardian ad litem.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

BOSLAUGH, J.

K.W., the natural mother of S.W., born December 8, 1980, has appealed from the September 12, 1984, order of the separate juvenile court of Douglas County, Nebraska, which terminated her parental rights to S.W. pursuant to Neb. Rev. Stat. § 43-292(6) (Reissue 1984). The appellant is 27 years old and the single mother of five children.

The principal assignment of error is whether the trial court's finding that the appellant refused to substantially comply with the orders of the separate juvenile court is supported by clear and convincing evidence.

An order terminating parental rights is reviewed de novo on the record in this court, giving great weight, where the evidence is in conflict, to the fact that the trial court observed the parties and witnesses and judged their credibility. An order terminating parental rights must be supported by clear and convincing evidence. *In re Interest of M.S.*, 218 Neb. 889, 360 N.W.2d 478 (1984).

Although the motion for termination of parental rights alleged failure to comply with the separate juvenile court's orders beginning on or about June 23, 1983, this case commenced in the summer of 1981. According to the appellant, she took S.W. to the emergency room at St. Joseph's Hospital, Omaha, Nebraska, on June 12, 1981, because she had noticed "transparent, clear, worms" in S.W.'s diaper.

On admittance, S.W., who was 6 months old, weighed only 7 pounds 8½ ounces. Her attending physician, Dr. David Cathro, testified: "The baby looked like something out of a

Cambodia refugee camp. She was just skin and bones, didn't look ill. It looked alert, but absolutely starved looking." No worms were ever found by any hospital personnel. S.W. was diagnosed as suffering from "failure to thrive" and hospitalized for 13 days. Despite extensive tests, no further problems were found or diagnosis made other than an observation that she had not received any immunizations to that date. The only treatment given S.W. was proper feeding and supplemental vitamins (a routine procedure owing to her premature weight); as a result, S.W. "quite remarkably" gained $26^1/_2$ ounces in 13 days, was discharged, and was placed in a foster home. The only cause attributed to S.W.'s condition was improper feeding. Dr. Cathro testified that he feared for S.W.'s life and would not return her to the appellant "unless I knew the mother had been worried about it. I think the mother needs help to realize how ill this child was."

A petition was filed on July 2, 1981, and a hearing held on July 13. S.W. was placed in the temporary custody of Douglas County Social Services for temporary foster care, and the appellant was given reasonable rights of visitation. Thereafter, a series of hearings took place which spanned more than the next 3 years.

At a hearing on August 27, 1981, S.W. was adjudged to be a child within the meaning of Neb. Rev. Stat. § 43-202(2)(b) (Reissue 1978). That section provided: "The juvenile court in each county . . . shall have jurisdiction as follows: . . . (2) Exclusive original jurisdiction as to any child under the age of eighteen years . . . (b) who lacks proper parental care by reason of the fault or habits of his parent, guardian, or custodian." Cf. Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1984).

On December 9, 1981, S.W. was placed in the custody of the State of Nebraska Department of Public Welfare for continued foster care as supervised by Douglas County Social Services. Additionally, the appellant was ordered to follow the first of several plans. The juvenile court ordered:

That [K.W.], child's mother, shall:

a. Participate in parenting programs and a nutrition class as arranged by the Court Service Officer and the Child Protective Service worker;

b. Cooperate with the Child Protective Service worker, the Foster Care Worker, the Court Service Officer and the child's guardian ad-litem, and make her home accessible to all the workers;

c. Have all her children in the home receive a physical and follow up with any recommendations made and that the results of such physicals be forwarded to the Juvenile Court.

A psychiatric evaluation made on October 23, 1981, disclosed that the appellant, although appearing "quite bright" intellectually, suffers from a "[p]ossible mixed personality disorder with traits of antisocial passive-aggressive and some emotional instability as well as some immaturity."

After a hearing on March 9, 1982, except for paragraph (c) thereof, which had been complied with, the order was essentially continued without alteration, and the appellant was told to "keep up your good work." The appellant was further given permission to conduct a home visit with S.W. However, when the appellant failed to appear for her regularly arranged visitation outside the home on a date preceding the home visitation, home visitation was discontinued "until [K.W.] maintains a regular schedule of visitation and appears for all visits she confirms through the proper channels."

At a hearing on June 9, 1982, it was ordered that home visits be allowed pending continued compliance with the regular schedule of visitations outside the home. It was further ordered that the appellant participate in individual counseling, including an alcoholism evaluation. This order was based, at least in part, on one social worker's perceptions of the appellant's emotional state. In a letter to the court, Bob Hayes wrote concerning eight sessions he had had with the appellant; the letter stated in part:

One important theme that repeatedly occurred was the way [K.W.] maintains tight control over herself, her children, and her extended family. . . . [K.W.] also demonstrated this control by insisting that the "system" was falsely accusing her of wrong-doing and that "someone" was out to get her. . . . Since [K.W.] was displaying her anger, her control and her resentments over

and over again, I felt it was worth exploring her usage of chemicals such as alcohol and drugs. [K.W.] adamantly denied any problem of this kind now in her life, but admitted that at one time she did drink heavily. She shared that she "got scared" and now leaves all mood-altering chemicals alone. In my opinion, the possibility of the personality problems associated with this disease could be present with [K.W.].

The evaluation given led to a finding that the appellant did not have an alcohol problem; a written report to that effect from two Child Protective Services workers was received in evidence at a hearing on August 9, 1982. That report further indicated, however, for the first time that "the current situation is worse."

As a result, the court ordered that appellant shall participate in counseling, locate adequate and suitable housing, be allowed reasonable visitation, and notify the court within 24 hours of a change in address. Similar orders were entered on January 28, March 28, June 30, and October 18, 1983, with variations, including cooperate with workers, "maintain regular and consistent visitation," provide a monthly financial statement, and meet with the workers every 2 weeks.

During the latter review hearings, the concern of the workers involved with the case about the appellant's refusal to accept responsibility for S.W.'s previous condition became the predominant focus. At a hearing on November 30, 1982, a service officer for the juvenile court stated:

[K.W.] refuses to accept responsibility for [S.W.'s] condition when she was placed in foster care, and I feel that if she does not work out these problems, that placing [S.W.] back in the home she could—if it was a lack of feeding and such—she could continue this probably without her being aware of it, and I feel that could place [S.W.] in danger. She is not accepting any responsibility for [S.W.'s] condition.

The reports presented from workers at the next hearing indicated that the appellant had been attending counseling sessions with relative regularity since that time; the quality of her participation, however, was debatable. Furthermore, this

compliance was somewhat short lived. At the termination hearing the coordinator of Family Support Civil Service testified that the appellant's weekly scheduled counseling sessions were terminated as a matter of policy on October 24, 1983, after the appellant had failed to report for a month previous. She further testified that between July 1983 and October 2, 1983, the appellant attended only two formal counseling sessions and that the appellant did not successfully complete her counseling nor achieve her goals.

Furthermore, during the time period alleged in the motion to terminate, the appellant moved five times without notifying the court of her address changes, and the appellant submitted none of the financial statements required by the court. Workers testified that all of their attempts at home visits had been unsuccessful and that they had received no replies from appellant in response to messages they had left in that regard. The evidence further shows that between September 16, 1983, and March 12, 1984, the appellant made no visits to S.W.; she resumed visits, although not consistently, after March 1984, during which time two of her sons had been placed in foster care and she was able to visit all three children at once.

The appellant presented evidence that she had attended $21 1/4$ hours of counseling in a 15-month period and that this period included time she was on a "waiting list" for an available counselor and when she was unable to attend counseling because it interfered with her schooling. While the appellant had a "sporadic" visiting history concerning scheduled visits away from her home, the revocation of home visits was the result of the appellant's failure to attend counseling. There was testimony that as a result of the completed nutrition classes, the appellant "seemed to know pretty much about" the subject.

Consideration must be made of these additional facts: the appellant has a checkered work history and her income is comprised mainly of welfare, food stamps, and ADC payments; the several homes the appellant provided for her four other children were also the homes for numerous other relatives of the appellant; that as a result of marijuana use by the appellant's brother, the juvenile court issued an order that "there shall be no alcoholic beverages or possession or any

consumption or use of any illegal drugs in the home of [K.W.]";
and that the appellant was in jail from June 11 to July 19, 1983,
for child abuse, the details of which are not in the record.

Perhaps the most significant fact in this case is the steadfast
refusal of the appellant to accept any responsibility for the
condition of the child at the time she was hospitalized. It is clear
from the medical evidence that the child was in a "starved"
condition, so severe that her life was endangered. There is
absolutely no corroboration for the mother's testimony about
"worms."

The record evidences that throughout the history of this
matter, the doctors, caseworkers, and others seeking to provide
for the best interests of S.W. were most concerned that the
appellant has failed to recognize that she was responsible for the
life-threatening condition that S.W. suffered from when this
case was first brought to the court's attention. Failing this
recognition, those involved fear that the episode could repeat
itself should S.W. be returned to appellant's custody.

Although at the beginning of the proceeding the mother
seemed to be willing to comply with the orders of the juvenile
court, this attitude changed and became one of indifference or
open defiance of the court's orders. Between July 1 and
October 24, 1983, the appellant attended only one complete
1-hour counseling session, which sessions she was to attend on a
weekly basis. From September 16, 1983, through March 12,
1984, the appellant failed to visit S.W. at all. The appellant,
repeatedly, refused and neglected to advise the social workers
when she moved to a different location. She refused to allow the
social workers to monitor home visitations and never supplied
the financial statements required by the trial court.

S.W. is now 4½ years old. She has spent the last 4 years of
her life in foster care. The appellant has not progressed to the
place where anyone familiar with the case, with the exception of
the appellant, believes the child should be returned to the
mother at this time. The record demonstrates that the appellant
often failed and neglected to even visit the child. As time
passed, the appellant exhibited less and less willingness to
cooperate and comply with the court-ordered plan, which was
intended to eventually restore the parent-child relationship. In

the end, her efforts were nonexistent.

The appellant is not asking this court to return custody of S.W. to her; rather, she argues that she should be given a new trial and more time to rehabilitate herself. Yet, as was stated in *In re Interest of Wanek*, 212 Neb. 394, 398, 322 N.W.2d 803, 806 (1982):

> We are concerned here with the best interests of the children, and when the natural parent cannot rehabilitate herself in a reasonable time after the adjudication hearing and the prognosis is poor not only for purposes of rehabilitation but also for correcting the conditions of neglect and dependency, the best interests of the children require that a final disposition be made without delay.

See, also, *In re Interest of W.*, 217 Neb. 325, 348 N.W.2d 861 (1984).

It is time that the child be placed in a stable environment.

> A child cannot be left suspended in foster care, and should not be required to exist in a wholly inadequate home. Further, a child cannot be made to await uncertain parental maturity. As we said in *In re Interest of R.D.J. and K.S.J.*, 215 Neb. 724, 728, 340 N.W.2d 415, 418 (1983): " ' "[W]e will not gamble with the child's future." ' "

*In re Interest of D.*, 218 Neb. 23, 29, 352 N.W.2d 566, 570 (1984).

The record supports termination of the appellant's parental rights.

Although not specifically assigned as error, the appellant argues that she was denied due process of law because the juvenile court refused to allow her counsel to inspect the case files maintained by two of the social workers that were assigned to the case.

By statute, the files are privileged, but a judge of the juvenile court "may, subject to applicable federal and state regulations, disseminate such confidential record information to any individual . . . providing services directly to the juvenile and such juvenile's parents or guardian and his or her immediate family who are the subject of such record information." Neb. Rev. Stat. § 43-2,108(3)(a) (Reissue 1984). From our

examination of the record we conclude that the appellant failed to show that the trial court abused its discretion in overruling the motion to produce.

When the motion to produce was overruled, the trial court granted a 3-week continuance, the third or fourth that had been granted, to permit the appellant to depose the two social workers. The depositions were taken, and they appear in the record. The witnesses were questioned at length and were cooperative in answering all of counsel's inquiries.

The appellant's counsel made no showing of any good cause other than the fact that the social workers referred to the files during their testimony in court and his unsupported statement that he had "reason to believe" there was information in the records in addition to that provided in the reports. What that information might be or what was his "reason to believe" was never disclosed to the juvenile court.

Upon consideration of the entire record and the particular circumstances in this case, we are unable to find any abuse of discretion. See *In re Interest of Ditter*, 212 Neb. 279, 322 N.W.2d 642 (1982).

The judgment of the juvenile court is affirmed.

AFFIRMED.