IN RE INTEREST OF J.S., S.C., AND L.S., CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. P.S. AND C.S., APPELLANTS, AND M.S., APPELLEE.

397 N.W.2d 621

Filed December 19, 1986.    No. 85-937.

Michael J. Elsken, for appellant P.S.

Richard L. Kohn, for appellant C.S.

Michael G. Heavican, Lancaster County Attorney, and Jan W. Sharp, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

BOSLAUGH, J.

The father of J.S., S.C., and L.S. and the mother of S.C. and L.S. appeal from the order of the separate juvenile court of Lancaster County terminating their parental rights. The mother of J.S. did not appeal the order terminating her parental rights, and, as her parental rights are not at issue, the use of the term parents in the following discussion refers solely to the father and the other mother involved unless otherwise indicated.

The children are the offspring from two different marriages. The natural father, P.S., was initially married to M.S., and two children, R.J.S. and J.S., were born of the marriage. The marriage was dissolved on August 11, 1977, and P.S. was given custody of both children. P.S. subsequently remarried, and two more children, S.C. and L.S, were born. C.S. is the natural mother of S.C. and L.S.

A petition was filed on June 26, 1972, which alleged that R.J.S. was a neglected child. The trial court found both natural parents, P.S. and M.S., incapable of caring for R.J.S. and on June 30, 1972, placed the child in foster care. R.J.S. has remained in foster care since that time, and his disposition is not an issue in this appeal.

On June 15, 1977, a second petition was filed, alleging that J.S. lacked proper care due to the neglect of her natural parents, P.S. and M.S. Temporary legal custody was given to the Lancaster County Department of Public Welfare, and she was placed in foster care. On February 21, 1979, J.S. was returned to P.S. and his second wife, C.S., on a trial basis.

A supplemental petition was filed on August 12, 1981, alleging that J.S., S.C., and L.S. were neglected children through the faults of P.S. and C.S. Custody of all three children was given to the Lancaster County Department of Public Welfare, and the children were placed in foster care. When this disposition was reviewed on November 9, 1981, the trial court continued foster care because the parents had not corrected the problems leading to the removal of the children.

On March 9, 1982, the disposition was again reviewed, and a trial placement of the children with their parents was ordered. Additional review hearings were held every 6 months. On November 30, 1983, the trial court found the parents were unable to care for the children. The children were placed in foster care and have remained in foster care since that time.

When the disposition was reviewed on December 18, 1984, the trial court found the parents were still unable to assume the care of their children, and foster care was continued. The parents were ordered to demonstrate that they could provide for themselves and control their mental health problems so that they could provide for the children. Further, the court ordered the parents to demonstrate they could provide a home for themselves and their children and to budget their income so as to pay for transportation to visit the children.

The matter was again reviewed in June 1985. The State recommended that visitation by the parents be terminated, but the trial court found the evidence was insufficient to show that the visitation was injurious to the children. Custody of the children was continued in the Department of Social Services, and the court again set out a plan for the parents to follow in order to regain custody of their children. The plan required P.S. to continue, and C.S. to begin and complete, mental health counseling, for both parents to cooperate with and participate in services directed by their caseworker, for the parents to maintain an appropriate living situation and demonstrate their ability to provide a stable home for their children, and for the parents to sufficiently control their mental health problems so that they could care for the children.

The third supplemental petition, filed September 3, 1985, sought termination of all parental rights to the three children.

The petition alleged that P.S. and C.S. had failed to demonstrate their ability to budget money and provide for the necessities of life for themselves and the children; that both parents suffered from mental disorders which prevented them from being able to parent their children; that neither parent had followed through with mental health treatment directed by the therapists; and that because of the neglect of the parents the children had remained in foster care. The petition further alleged that the parents had substantially and continuously or repeatedly neglected their children and refused to give them necessary care. The petition sought a determination that the children were within the purview of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1984) and that reasonable efforts to correct the problems, under the direction of the court, had failed. The petition further alleged that termination was in the best interests of the children; that the parents were unable to parent due to mental illness or mental deficiency; and that there were reasonable grounds to believe the conditions preventing them from parenting would continue for a prolonged and indeterminate period.

The matter came on for trial on October 8, 9, 25, and 28, 1985.

The trial court found that the State had proven by clear and convincing evidence that parental rights should be terminated. Specifically, the court found that the parents had not provided the necessities of life for their children; that both parents suffered from mental disorders which prevented them from being able to parent; that neither parent had followed through with mental health treatment directed by the therapists; and that both parents had substantially, continuously, and repeatedly neglected the children and refused to give them necessary parental care and protection. The court found the children were children as described in § 43-247(3)(a); that reasonable efforts to correct the problem under court supervision had failed; and that the parents were unable to parent due to mental illness or deficiency and would remain in such a condition for a prolonged and indeterminate period. This appeal followed.

Both appellants assign as error the trial court's finding that

the evidence presented was sufficient, clear, and convincing to support a finding of termination. Appellant C.S. also assigns as error the trial court's overruling of her objection to the testimony of Dr. William McNeil as to whether her mental illness affected the children and presented harm to them, and whether C.S. would be able to parent in the future.

An appeal from an order terminating parental rights is reviewed by this court de novo on the record. *In re Interest of A.L.N.*, 223 Neb. 675, 392 N.W.2d 780 (1986); *In re Interest of V.B. and Z.B.*, 220 Neb. 369, 370 N.W.2d 119 (1985). The order must be supported by clear and convincing evidence and issued only as a last resort when no reasonable alternative exists. *In re Interest of A.L.N., supra.* See, also, *In re Interest of P.F.*, 222 Neb. 44, 381 N.W.2d 921 (1986). The primary consideration in such a case is the best interests of the child. *In re Interest of A.L.N., supra.* As we stated in *In re Interest of D.*, 218 Neb. 23, 29, 352 N.W.2d 566, 570 (1984), "A child cannot be left suspended in foster care, and should not be required to exist in a wholly inadequate home. Further, a child cannot be made to await uncertain parental maturity."

From our review of the record we find that the State presented clear and convincing evidence that the parents are unable to care for the children, that they will remain unable to do so for an indeterminate period of time, and that termination is in the best interests of the children. Although the parents have made some attempts to correct the problems which led to the placement of the children in foster care, the record shows a pattern of parental conduct that demonstrates that the parents will never be able to adequately care for their children.

P.S. has been involved with the State of Nebraska with regard to the parenting of his children since 1972. C.S. has been involved with the State since 1979. J.S. was first placed in foster care in July 1977, where she remained until February 1979, a period of almost 2 years. She was then returned to her parents and remained with them until August 1981. At that time she was again placed in foster care, where she remained until March 1982, a period of 7 months. She returned to her parents and remained there for 18 months, until September 1983, when she was again placed in foster care. She has remained in foster care

since 1983, a period of 3 years. Thus, J.S. has been in foster care over one-half of the time since 1977. S.C. and L.S. were first placed in foster care in August 1981. They were returned to their parents on a trial basis in March 1982, where they remained until September 1983, when they were again placed in foster care and have there remained. Thus, these two children have been in foster care more than one-half of the time since 1981.

Extensive testimony was presented at the hearing concerning the parents' ability to parent the children and whether the parents had followed the court-ordered plan of rehabilitation. There was some evidence that P.S. had sexually molested J.S. when she was a small child. Since 1977, the family has had a succession of caseworkers who have attempted to work with the family on housekeeping, maintaining contact with mental health professionals, and meeting the needs of their children.

A caseworker, Mary Osborne, testified that on her first visit with the family in September 1982, the house was adequately clean, but the parents stated they had missed an appointment with their mental health counselor because they overslept. Later that month, at a subsequent home visit, the house was not as clean as before but still adequate. During the home visits in October 1982, the condition of the house continued to deteriorate. The parents, however, did not feel the condition of the house was a problem. By November 1982 the house was very dirty, P.S. had moved out and C.S. was subsequently admitted to the Lincoln Regional Center, and the children had been placed in foster care.

The children were returned to their parents on April 7, 1983. For the next 7 months Osborne or another caseworker visited the family twice a month and testified that the condition of the house deteriorated rapidly. Osborne testified that in June 1983 there were "lots of cockroaches and insects in the home crawling the walls." Again, the parents did not recognize the condition of the home as a problem. In July 1983 the house was extremely dirty, the cockroach problem had worsened, and there was a very strong odor of urine in the house.

By August 1983 the situation had grown worse, the floors were extremely dirty, there were dog feces throughout the

house, the sheets on the boys' beds were "almost black," and there was a strong odor throughout the house. Further, the screens leading to the second-story roof had been pushed out, and toys were observed on the roof of the house. P.S. stated the children had been playing there. P.S. stated he did not realize the cleanliness of the house was "that bad." The bathroom was also very dirty. It was the caseworker's opinion that the house presented a health hazard at that time. The house remained in the same condition throughout August 1983. The caseworker informed C.S. that foster care placement was again indicated. Shortly thereafter, C.S. was committed to the Lincoln Regional Center and the children removed by the police.

On cross-examination Osborne testified that it was her opinion the parents have a pattern of behavior which led her to conclude that their parental rights should be terminated. The pattern, as she described it, is that when C.S. is initially released from intensive mental health treatment, the parents are able to establish an adequate home; but when the children are returned, the parents cannot sustain their mental health treatments or keep the house in an adequate condition.

Murial Lau, a foster parent for the children from December 1982 until April 1983, and from September 1983 until August 21, 1985, testified that P.S.'s personal hygiene was so poor that she requested his visits in her home be terminated. She testified that C.S. also did not have good personal hygiene. Lau testified that she observed behavioral problems in the children following visits with their parents, including destroying gifts given them by the parents, rebelliousness, fighting among the children, and soiling or wetting their pants. The behavioral problems began after the children returned to the Laus' residence in September 1983. The children also exhibited problems at school.

Dr. William McNeil, a psychologist employed by the Child Guidance Center, was a member of a team which evaluated all three children in May 1984. The children were tested individually, and the team then reviewed the data. The team was provided background information from Child Protective Services concerning the parents. The team concluded the children "had and were responding negatively to the parents' lifestyle." The children exhibited a great deal of anxiety related

to their physical safety and the meeting of their basic needs at home.

Although the children had formed a strong attachment to their parents, the nature of the attachment was one of insecurity and was viewed by the team as a negative rather than positive factor in the children's lives. The team concluded that it was important for the children to have permanency and stability in their lives and that the parents could not provide it. The team recommended that the parental rights be terminated and the children put in an adoptive situation.

The team also concluded that parental visitation was adverse to the children's interests. In light of their data compilation, the team concluded that it would be damaging to return custody of the children to their parents because the parents' past behavior evidenced their inability "to control themselves and to regulate their own lives, much less the lives of their children. They could not help the children organize the environment in a very clear, coherent way."

Dr. McNeil reviewed the documentation provided to him by various agencies regarding the parents and, based on that data, formulated an opinion concerning the parents' ability to care for the children. It was his opinion that while the parents had at times demonstrated positive parenting skills and maintained an adequate house,

> by and large these changes were not integrated into their lifestyle on a very consistent basis, that by and large the environment was often chaotic and that it did not look as if they had responded very well to the intervention of other people in the community over a fairly long period of time.

In his opinion the positive changes "have to become integrated and made part of the individual and part of a way of life." He did not find enough evidence in his review of the parents' records to indicate the positive changes were stable. Dr. McNeil also concluded that the family is "pretty resistant to change." Dr. McNeil's findings were later verified by Dr. Howard Halpern, who concurred in his conclusions.

Terri DeBuhr, a case aide for the Department of Social Services, testified that each time the parents moved, the house started out in good condition and became progressively worse.

Marilyn Schwebke, another case aide, testified that she had been involved with the family from early 1983 through August 1984. In her opinion, based on her experience with the family, neither parent was able to perceive and meet the emotional needs of the younger children.

C.S.'s uncle testified that he had observed filthy conditions in the appellants' homes beginning in 1978. He testified that the hygiene of the children and the parents was always poor when he visited them. In his opinion the parents were unable to care for themselves, much less their children.

Dr. William Stone testified that C.S. had told him she had been in the Lincoln Regional Center every year since 1980. He testified that she missed five of eight scheduled appointments with him. C.S. had indicated to him that she had no need to work on any mental problems, aside from getting other people to realize that she did not have any. Based on the results of tests administered to C.S., Dr. Stone concluded that C.S. had some "fairly serious emotional problems," had difficulty perceiving reality, and had hostility to authority figures.

Both parents missed so many appointments that Dr. Stone warned them that continued failure to appear would result in his refusal to see them. The parents missed the very next appointment, but Dr. Stone agreed to set up one more appointment to go over their test results, and the parents again failed to appear. Dr. Stone testified that his diagnosis of C.S. was that she suffers from chronic schizophrenic disorder. He concluded that in her case the condition would be present for a prolonged, indeterminate period. In his opinion C.S. would require supportive therapy over an indefinite period of time. Dr. Stone also testified that because of her mental condition C.S. would sometimes pose a danger to the children because her contact with reality would not allow her to care for them.

Dr. Stone further testified that P.S. had indicated he could not tolerate the children for extended periods of time and that he had been sexually involved with J.S. at one point. His diagnosis of P.S. was that P.S. was overtly psychotic, that his thinking was very confused and hostile, and that he was unable to perceive reality. It was Dr. Stone's opinion that P.S.'s condition would continue indefinitely. He also testified that, in

his view, it was unlikely the parents could provide care for and meet the needs of their children.

Linda Freeman, an assigned homeworker, testified that the parents missed half of their scheduled appointments with her and were uncooperative and unresponsive during the $2^1/_2$ months she attempted to work with them in late 1982. Another caseworker, Charlie Bennett, testified that, in his experience with the parents, he observed a pattern of behavior with regard to the cleanliness of their homes: when the parents first moved into a new place, the housekeeping was adequate but then deteriorated.

Dr. Daniel J. Weber, the psychiatrist most recently involved with the parents, testified the two had missed quite a number of appointments. His prognosis was that P.S. may be better able to work on his emotional problems than C.S. because C.S. lacks motivation to do so. He also stated that his prognosis of C.S.'s being able to cope with her mental problems sufficiently to be able to parent was poor.

Lawrence Reznicek, a clinical social worker who has worked with the parents intermittently since 1981, testified that he had observed a pattern of deterioration in the parents' ability to cope with life.

Lorie Fink, the family's caseworker, testified as to the parents' poor personal hygiene, problematic parenting skills, and mental health problems. As recently as September 1985, only 1 month before the termination hearing, the mother still was not consistently participating in mental health counseling. Fink testified that she had informed the parents in April 1985 that a request for termination had been made, and the reasons why it had been recommended: the mental health problems, living skills, housekeeping, and inappropriate use of medications. Fink testified that she visited the parents at their apartment the morning before she testified at the hearing, on a scheduled visit, and found the home dirty and cluttered, flies in the refrigerator, and a strange odor throughout the apartment. The only food in the house was a box of powdered milk. Both parents told her they had not been seeing their mental health counselors.

C.S. testified that in her opinion there was no housekeeping

problem when Fink last visited; that she really did not have a mental health problem; and that she did not clean up after the dogs because that was not her job.

P.S. testified that in his opinion there had been no housekeeping problem on Fink's last visit and that the parents would be able to parent their children.

The evidence is clear and convincing that the parental rights of P.S. and C.S. to the three children should be terminated. There is extensive evidence concerning the parents' mental health problems, the effects of those problems, and the parents' consistent failure to obtain treatment over the past several years.

Further, there was an abundance of evidence of the parents' failure to comply with the various rehabilitation plans ordered by the court. It is clear that the parents are unable to care for their children and will be unable to do so in the foreseeable future. The children have spent the majority of their lives in foster care but are now in a potentially adoptive home which offers them permanence and stability. Like the child in *In re Interest of D.*, 218 Neb. 23, 352 N.W.2d 566 (1984), these children should not be left suspended in foster care or returned to a wholly inadequate home.

The assignment of error concerning C.S.'s objection to Dr. McNeil's testimony regarding the impact of her mental health problems on her ability to parent was not briefed. Accordingly, it will not be considered. Neb. Ct. R. of Prac. 9D(1)d (rev. 1986). See, also, *State v. Lynch*, 223 Neb. 849, 394 N.W.2d 651 (1986).

The judgment of the juvenile court is affirmed.

AFFIRMED.