IN RE INTEREST OF J.W., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, v. R.J.W., APPELLANT.
402 N.W.2d 671

Filed March 13, 1987.   No. 86-515.

Mary K. Thielen of Taylor, Fabian, Thielen & Thielen, for appellant.

W. Russell Bowie of Ashford, Bowie & Higgins, P.C., guardian ad litem.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

BOSLAUGH, J.

R.J.W. has appealed from the order of the separate juvenile court of Douglas County, Nebraska, which terminated her parental rights to her son J.W.

J.W. was born out of wedlock to the appellant on July 9, 1984. By November of 1984, the 16-year-old appellant had determined that she was unable to properly provide for the 4-month-old J.W.'s needs. As a result, she contacted the Department of Social Services in order to voluntarily place her child in foster care. J.W. has remained in foster care since that time.

On November 28, 1984, a petition was filed alleging that J.W. and his brother, R.H.W., born September 16, 1982, were children within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 1982), being under 18 years of age and homeless

or destitute or without proper support through no fault of their natural mother. According to the appellant, she herself was in foster care in 1982 when she had her first child, R.H.W.

At a December 11, 1984, detention hearing, the appellant did not contest the continued placement of J.W. with the Department of Social Services or of R.H.W. with his natural maternal grandmother, D.W., with whom he had lived since birth.

At the adjudication hearing held on January 31, 1985, the appellant stipulated to the allegations in the petition. The court found the facts in the petition sufficient to bring the children within the meaning of § 43-247(3)(a) and ordered that they be placed in the custody of the Department of Social Services. R.H.W. was ordered to continue to reside with his grandmother. The appellant was granted reasonable rights of visitation.

At a March 6, 1985, disposition hearing, there was evidence that the appellant had visited J.W. on only three occasions since his placement in foster care in November of 1984. There was also evidence that she had attempted suicide 1 month after J.W.'s placement. After reviewing the recommendations of the court service officer, guardian ad litem, and Child Protective Services (CPS) worker, the juvenile court entered an order requiring:

3. That [R.J.W.], mother, shall maintain regular visitation with [J.W.] as arranged by the Nebraska Department of Social Services.

4. That [R.J.W.] shall submit to a psychological and psychiatric evaluation and shall comply with all recommendations as a result of these evaluations; that the Court Service Officer shall make the arrangements.

5. That [R.J.W.] shall participate in parenting classes as arranged by the Court Service Officer.

6. That [R.J.W.] shall obtain and maintain adequate housing for herself and her children.

7. That [R.J.W.] shall cooperate with the workers involved and notify them within 72 hours of any change in residence.

Substantially similar orders were entered by the court following

review hearings on July 9, 1985, November 13, 1985, and March 12, 1986.

On March 17, 1986, a petition to terminate the appellant's parental rights to J.W. was filed. It alleged that J.W. was a child within the meaning of Neb. Rev. Stat. § 43-292(6) (Reissue 1984), because reasonable efforts, under the direction of the court, had failed to correct the conditions leading to the determination that J.W. was a child within the meaning of § 43-247(3)(a). Specifically, it alleged that the appellant had failed to comply with the court-ordered plan of rehabilitation by (1) visiting J.W. only 13 times in 15 months, (2) twice failing to keep scheduled appointments for psychiatric evaluations, (3) attending only one parenting class, (4) failing to obtain independent and stable housing, and (5) failing to maintain contact with her probation officers and to keep them informed of her situation and whereabouts. Following the presentation of evidence at a May 8, 1986, hearing, the court entered an order terminating the appellant's rights to J.W.

On appeal, the appellant maintains: (1) The evidence was not sufficient to support termination of her rights; (2) The court erred in finding it was in J.W.'s best interests to terminate R.J.W.'s parental rights; and (3) The order terminating her parental rights is contrary to law.

An order terminating parental rights is reviewed by this court de novo on the record on appeal. *In re Interest of J.S., S.C., and L.S., ante* p. 234, 397 N.W.2d 621 (1986). Where there is a dispute in the evidence, however, the reviewing court must give great weight to the juvenile court's findings because the trial court heard and observed the parties and witnesses. *In re Interest of L.J., J.J., and J.N.J.*, 220 Neb. 102, 368 N.W.2d 474 (1985). The termination order must be supported by clear and convincing evidence and should only be issued as a last resort when no reasonable alternative can be said to exist. *In re Interest of J.S., S.C., and L.S., supra.* Nevertheless, a primary consideration in termination proceedings is to reach a determination that serves the best interests of the child. *In re Interest of J.S., S.C., and L.S., supra.*

The appellant initially maintains that there was not clear and convincing evidence before the trial court to show that

reasonable efforts, under direction of the court, had failed to correct the conditions which led to the determination that J.W. was a child as described in § 43-247(3)(a).

By as early as the March 6, 1985, disposition hearing, the court service worker, CPS worker, guardian ad litem, and court all expressed concern over the appellant's failure to regularly visit J.W. The evidence indicates that although weekly visits were authorized, between his placement in November of 1984 and the March 6 hearing, the appellant visited J.W. on only three occasions. The appellant testified that visitation with J.W. was important to her but that transportation problems had made it difficult. At the court's request for his assessment of the situation, the deputy county attorney warned the appellant that if her performance did not improve, termination proceedings would be considered. The court then entered its order requiring the appellant, inter alia, to maintain regular visitation with J.W. as arranged by the Department of Social Services.

At the next hearing on July 9, 1985, the evidence showed that the appellant had visited J.W. again only two or three times in 4 months. The appellant, through her attorney, acknowledged the need to better comply with the order and was warned by the court to follow the order or face termination of her parental rights.

At the next review hearing, held on November 13, 1985, the appellant did not appear, and the evidence again showed that she had visited J.W. only twice since the previous hearing. No one at this hearing knew of her whereabouts. The court warned that if the appellant did not take action, her rights to J.W. would be terminated.

At the March 12, 1986, review hearing, the evidence was that the appellant had visited J.W. on only 6 of 14 opportunities since the November hearing. According to the court service officer and CPS worker, out of the 15 months J.W. had been in foster care, the appellant had visited him on only 13 occasions. The appellant, through her attorney, disputed that fact, claiming that she had visited J.W. on a more frequent basis.

The motion to terminate was filed on March 17, 1986, and the hearing on the motion was held on May 8, 1986. The CPS worker testified that the appellant had actually visited J.W. an

estimated 15 times in the 16 months he had worked on the case. He also stated that he had informed the appellant that transportation could be provided if that was ever a problem in visitation and that in fact, when she did visit, she usually came by means of transportation that he had arranged. The CPS worker also indicated that he had discussed with the appellant the importance of visiting her son, particularly following the November 1985 hearing.

There is evidence that the appellant made greater efforts to visit her son following the November hearing. On one such occasion, she missed a visitation when she showed up without previously arranging a visit. In late November she canceled a visit because she had just given birth to a third child. Following a December 10, 1985, visit, the appellant did not visit J.W. or contact the CPS worker for 3 weeks. She explained that she had been hospitalized for 2 weeks as the result of having been stabbed on December 13, 1985. After this 3-week hiatus from visitation, the CPS worker advised the appellant that he would not schedule any further visits until she had consulted with her attorney regarding the importance of her visits.

The appellant, eventually, did consult with her lawyer and the CPS worker confirmed that subsequent to that date, her pattern of visitation improved. From January 31 through March 4, 1986, she missed only one visit that was within her control to make.

Nevertheless, the CPS worker questioned why this improvement had occurred. On cross-examination by the guardian ad litem, the CPS worker estimated that only five of her many missed visitations over the 64 weeks that J.W. was in foster care could be attributed to circumstances beyond her control. He also acknowledged that in July of 1985, the appellant had exhibited a similar pattern of intense visitation for a very brief period of time, which was ultimately followed by several months with no visits at all.

The court-ordered rehabilitation plan also required the appellant to submit to both psychological and psychiatric evaluations. These evaluations were recommended by the team workers following her suicide attempt on December 15, 1984. A psychological evaluation was conducted on March 28, 1985, by

Peter Knolla, a psychologist. The appellant was found to be functioning in the retarded, borderline deficient level of intelligence; to be functionally illiterate; and to have a normal adolescent personality, with mental retardation and passive, acting-out, childlike defense impulses.

At the termination hearing, the court service officer testified that the appellant had missed scheduled psychiatric evaluations in April and August of 1985. The appellant explained that she had missed the first appointment due to illness and the second because she thought it was for "crazy folks." She testified that she promised to keep the appointment for a third evaluation when scheduled, but the arrangements were never made because the court service worker believed she would not attend.

The appellant's performance regarding the parenting classes required by the court's order was poor. She attended one class in June of 1985, dropped in on another class in February of 1986, and finally, after the filing of the petition to terminate, enrolled in classes on April 9, 1986. She had attended two parenting classes subsequent to April 9 and two others had been canceled by the instructor. The instructor did not know whether she could assist the appellant in improving her parenting skills in the future because the instructor was unsure whether the appellant would follow through with the course.

The rehabilitation plan also required the appellant to obtain and maintain adequate housing for herself and her children. The court service worker testified that appellant had not complied because she failed to obtain an independent or stable place of residence. Further testimony showed the appellant had lived in five or six different residences since the case began and at the time of the termination hearing was residing in a house with her mother's boyfriend. The appellant indicated that she sometimes lives with her mother at another Omaha residence.

The final requirement of the rehabilitation plan was that the appellant cooperate with the workers and notify them of any change of residence within 72 hours. The court service worker testified she was not informed on a regular basis of the appellant's moves and on occasion did not know how to reach her. The appellant admitted she only contacted the court service worker "every now and then," but indicated that she had

informed the CPS worker of her most recent move. The evidence indicates that frequently both the court service and CPS workers had to track her down.

The juvenile court was not required to implement a plan of rehabilitation. *In re Interest of M.B., R.P., and J.P.*, 222 Neb. 757, 386 N.W.2d 877 (1986). But failure to comply with such a plan, where the court has ordered a parent to make reasonable efforts to rehabilitate, presents an independent reason justifying termination of parental rights. *In re Interest of L.J., J.J., and J.N.J.*, 220 Neb. 102, 368 N.W.2d 474 (1985).

The evidence in the present case is both clear and convincing in showing the appellant's noncompliance with the plan. Her visits were sporadic at best, and there were long periods of time where she did not visit J.W. at all. She missed two opportunities for a psychiatric evaluation, and her only excuses for missing the later one were that it was for crazy people and she thought it unimportant. The appellant's explanation for her poor showing on the parenting classes was that they made her uncomfortable.

Improvements in the appellant's visitation just prior to the filing of the petition and her attendance at parenting classes following the filing are unimpressive. As this court noted in *In re Interest of D.*, 218 Neb. 23, 28, 352 N.W.2d 566, 570 (1984):

> As all too frequently occurs in cases such as the one before us, the enthusiasm or receptivity of a parent toward a rehabilitation program seems to intensify as the time for a dispositional hearing approaches. A practical program of parental rehabilitation should not be viewed as our system's indulgent toleration of an otherwise intolerable situation. A parent afforded a program of rehabilitation must realize that the courts will examine a pattern of parental conduct in determining an appropriate disposition for the best interests of the child. In cases such as this the past is an indication of the future.

The appellant's brief period of improved compliance just prior to and after the filing of the motion to terminate is similar to the pattern she exhibited in July of 1985, which was ultimately followed by over 3 months of not seeing the child. The evidence here was sufficient to terminate R.J.W.'s parental rights.

Further, we must agree that it was in J.W.'s best interests to

terminate R.J.W.'s parental rights. This court has frequently held that where a parent fails to rehabilitate herself within a reasonable time, the best interests of the child require that a final disposition be made without delay. See *In re Interest of A.L.N.*, 223 Neb. 675, 392 N.W.2d 780 (1986). Temporary custody situations are attendant with many problems and a child cannot, and should not, be left suspended in foster care, nor be made to await uncertain parental maturity. *In re Interest of D., supra.*

In the present case J.W. was 22 months old at the time of the termination hearing and had been in foster care since the age of 4 months. The appellant was 17 years of age at the time of the hearing. The record shows she has two other children, is unemployed, lives on social security benefits, has a ninth-grade education, and has a borderline deficient level of intelligence.

The above are not the reasons why the appellant's parental rights were terminated. Instead, it was her failure over a period of 16 months to cooperate with and take advantage of the court's and support workers' efforts and services, as well as her failure to visit J.W. The evidence shows that the infrequency of her visits resulted in J.W.'s being uncomfortable when visits did occur. When the frequency of the appellant's visits increased, J.W. became more comfortable, but that may have been due in part to the fact that R.J.W. was accompanied by other children.

> Parental inability to reach heights of economic success is no basis to sever the precious relationship which normally exists between parent and child. However, the same system of laws pertaining to juveniles cannot reward parental bankruptcy evidenced by indifference or inexcusable lethargy adversely affecting the life and living conditions demanded by a child's personal dignity.

*In re Interest of D., supra* at 29, 352 N.W.2d at 570. J.W. has spent over three-quarters of his life in foster care. After his first 4 months, his mother has been a part of that life for only approximately 15 to 16 hours. The claim that termination of the appellant's parental rights was not in J.W.'s best interests is without merit.

Finally, the appellant contends the termination was contrary to law because the record failed to establish by clear and

convincing evidence that termination was the only reasonable alternative remaining.

In the recent case of *In re Interest of M.B., R.P., and J.P.*, 222 Neb. 757, 386 N.W.2d 877 (1986), we held that the primary consideration in termination proceedings is the best interests of the child. While termination should be considered a last resort, § 43-292 requires that the best interests of the child and evidence of fault or neglect be considered together in reaching such a determination. *In re Interest of M.B., R.P., and J.P., supra.*

The record establishes that termination of the appellant's parental rights to J.W. was not contrary to law. The judgment is affirmed.

AFFIRMED.