IN RE INTEREST OF Z.R., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. J.R.S., APPELLANT.
415 N.W.2d 128

Filed November 6, 1987.    No. 87-057.

Leo J. Eskey, for appellant.

Dean Skokan, Dodge County Attorney, and Joe Stecher, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and GRANT, JJ., and COLWELL, D.J., Retired.

BOSLAUGH, J.

J.R.S. has appealed from the order of the county court

terminating her parental rights to her son.

On October 22, 1982, a petition was filed alleging that the appellant's son, who was born September 19, 1980, was a child as defined in Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 1982),

whose parent, guardian or custodian neglects to provide proper or necessary subsistence, or other care necessary for the health, morals, or well-being of such juvenile or who is in a situation dangerous to life or limb or injurious to the health or morals of the juvenile.

At a detention hearing on October 26, 1982, the matter was continued to allow the appellant to enter inpatient treatment at the Hastings Regional Center. The care, custody, and control of the child remained with Dodge County social services for placement in the home of the appellant's mother. The court further ordered that the appellant, her mother, and the child were not to have contact with Deno McCracken, a friend of the appellant's.

On December 7, 1982, all parties involved agreed to a 5-month continuance. The State explained to the court that the juvenile petition had been filed because McCracken had been living with the appellant and that there was evidence that he had abused the child. McCracken at that time was incarcerated in the Dodge County jail, but was due to be released in 5 months. The continuance was allowed in order to determine whether any further problems would arise once McCracken was released.

On March 16, 1983, the court heard testimony from a social worker, who recommended that the child continue to live with his grandmother. The court agreed with this recommendation and also allowed the appellant to reside in the home with her son.

The hearing on the petition to declare the child to be a child within the meaning of § 43-247(3)(a) was held on April 6, 1983. The appellant testified that when her son was about 1 year old, McCracken had bitten him on the face, leaving a bruise. She testified that she, too, had bitten her son after he had bitten her. When questioned whether she thought it cruel to bite a 1-year-old child, she responded, "Not any crueler than him biting me." Testimony showed that both McCracken and the

appellant had a drinking problem, and the appellant testified that McCracken had beaten her while he was drunk. The appellant had recently served a 60-day jail sentence for violating the terms of her probation in a separate criminal matter. Under the terms of the probation order, she was to have no contact with McCracken, which she violated by sending letters to him in the Dodge County jail. The appellant testified that she would have no further contact with McCracken.

The child continued in the grandmother's care during the appellant's incarceration.

In the opinion of the grandmother, it was not in the child's best interest to have contact with McCracken. She became especially concerned for the child's well-being after seeing the appellant's black-and-blue face after she had been beaten by McCracken.

The court found by clear and convincing evidence that the child was a juvenile as described in § 43-247(3)(a), in that the appellant had neglected to provide proper care necessary for his health, morals, or well-being, and that at the time the petition was filed, he was in a situation injurious to his health and well-being. The court stated that it considered McCracken to be "a very violent person with some very dangerous characteristics." The court ordered the appellant not to have contact with McCracken, and allowed the child to remain in his grandmother's care. The court admonished the appellant that if she contacted McCracken, she had "better not even think about taking [her son], because you're placing him in a very dangerous situation." The appellant responded that she would not contact McCracken. Social services was directed to prepare a rehabilitation plan for the appellant.

An evaluation hearing was held on May 11, 1983. The court directed the appellant to comply with a rehabilitation plan, which required her to do the following:

1. Enroll in S.T.E.P. classes scheduled to begin in September 1983.

2. Attend a parent support group.

3. Participate in child development courses.

4. Facilitate the child's Head Start application.

5. Continue full-time parenting responsibility for the child,

and when working or attending class arrange for child care.

6. Attend programs on child abuse.

7. Obtain a GED.

8. Work with CETA and vocational rehabilitation in an attempt to further her education.

9. Find suitable employment.

10. Abstain from drug and alcohol usage and avoid associates by whom such usage is encouraged.

11. Develop a monthly budget.

The order also provided that the child remain in the custody of Dodge County social services for placement with the appellant, provided she continued to live at her parents' home.

A supplemental petition to terminate parental rights was filed on August 22, 1983. At a hearing held on October 5, 1983, the supplemental petition was read into the record.

The supplemental petition alleged that on or about August 3, 1983, the appellant had left her parents' residence, taking the child with her, in contravention of the May 11, 1983, order. At a later hearing the appellant admitted that she had taken her son to Omaha to live with Deno McCracken, which violated the April 6, 1983, order that had specifically provided that she have no contact with McCracken. The petition further alleged that under Neb. Rev. Stat. § 43-292(6) (Reissue 1984), grounds existed for termination of parental rights, due to the fact that the child had been found to be a juvenile within the meaning of § 43-247(3)(a) and that reasonable efforts under the direction of the court had failed to correct the conditions which led to that determination.

The appellant denied the allegations and asked that care of her son be returned to her mother. The court rejected that request and ordered that the child remain in foster care, with supervised visitation by the appellant.

On December 28, 1983, the State requested a continuance in order to give the appellant time to work on some short-term goals. Those goals included finding employment, signing up at the Nebraska Job Service, and getting on a waiting list for low-income housing. The trial court ordered that the appellant have unsupervised visitation and overnight visitation every other week.

The next hearing was held February 29, 1984, to determine the appellant's progress and to determine the child's best interests. The appellant testified that she had obtained part-time employment at a nursing home and wanted to work toward certification as a care staff member. She did not know how long it would take to become certified and said that she would not pursue the plan if a better paying job came along. Child Protective Services supervisor Connie DeBord testified that the appellant had been having overnight visitation every other week and a 2-hour visitation during the other week. She stated that there had been some problems with the visitations, in that the child was coming back to the foster home tired and worn out due to all the people and activity at the appellant's home, and that she needed to spend more time alone with the child.

At the conclusion of the hearing the court ordered that a family evaluation be conducted by Dr. Ann Taylor of Omaha to assess the strengths and weaknesses of the appellant's relationship with her son and that the appellant explore the possibility of entering the Child Saving Institute's single-parent program. A second rehabilitation plan incorporated in the court order provided that the appellant continue her employment, work toward certification as a care staff member, attend counseling with the child's therapist as recommended, establish an appropriate residence for herself and her son, abstain from drug and alcohol use, and have no contact with Deno McCracken.

The next hearing was on August 29, 1984. Child Protective Services supervisor Connie DeBord testified that none of the items on the rehabilitation plan adopted by the court at the previous hearing had been complied with and that no progress had been made. Overnight visitations were stopped when the appellant was arrested for DWI and possession of a controlled substance. However, those charges were dropped prior to the hearing. Overnight visits were also stopped because the child continued to come home very tired from his visits.

DeBord testified that the foster mother was concerned because after some of the visitations the child would masturbate and on one occasion had touched one of her sons on the

buttocks and anal area. This led to concerns about possible sexual abuse in the child's past, or during visitation.

The rehabilitation plan of February 29, 1984, required the appellant to continue employment and work toward certification as a care staff member. DeBord testified that the appellant had quit her job at the nursing home, then went to work at the Village Inn in March, but lost that job in April after she was arrested. She was not employed at the time of the hearing. The rehabilitation plan also required the appellant to visit with the child's therapist. DeBord testified that the appellant had made an appointment, but did not show up. The plan also called for the appellant to establish an appropriate residence for herself and the child. DeBord testified that the appellant had recently married, but the couple had not yet established their own residence. As to the child's progress, DeBord testified that he was doing very well in the foster home and had made good progress in the counseling sessions at the mental health clinic. The court continued the matter because it did not yet have the family assessment report from Dr. Taylor.

The next hearing was held on May 15, 1985, at which time the reports from Dr. Taylor had not yet been received.

The appellant testified that she had been employed for the past 9 months; that she had not used drugs or alcohol for the past 9 months; that she had rented a house in which she and her husband, R.S., lived; that she had not had contact with Deno McCracken; that she had not been to any counseling sessions since December; that she had not taken any parenting classes; and that she had not attended any programs on child abuse.

A protective services planning review report which was received indicated that the appellant continued to have supervised weekly visitations and that the child had bonded to his foster parents. Joyce Leedahl, who supervised the visits, reported that the child was always ready to return to his foster home and would remind Leedahl at the end of a visit that it was time for him to "go home" now.

The appellant requested additional visitation. The matter was continued in order to give the guardian ad litem time in which to make a recommendation as to whether an increase in visitation should be allowed. The court ordered that future

testing and evaluations should include R.S.

The next hearing was held on July 31, 1985. Child Protective Services caseworker Sharon Davis testified that the person who supervised the child's visits felt that the child was still afraid of R.S. Davis also testified that the appellant was still employed, but that she had missed two of the last four meetings with the child's therapist and that she had not become involved in the domestic abuse program. The appellant testified that she had stopped attending the required AA meetings, but that she was going to become involved in the domestic abuse programs and that she would begin attending a parenting class the following week.

The testimony indicated that R.S. had done little to facilitate any family progress.

The report from Dr. Taylor indicated that her evaluation of the child showed him to be very fearful of returning to his mother's home and that he seemed to have emerged from a background of emotional rejection. In her evaluation, Dr. Taylor indicated that R.S. believed it was not necessary for him to participate in the same rehabilitation steps as the appellant because no child was removed from him due to his parenting. R.S. did participate in an evaluation by the Pathfinder Alcohol-Drug Outpatient Clinic in Fremont, which concluded that R.S. was chemically dependent and at the crucial stage of alcoholism. The clinic recommended that, at a minimum, R.S. participate in its outpatient program, which R.S. refused to do. R.S. failed to undergo a psychological evaluation as previously ordered by the court, because he could not afford the test cost of $450. However, Davis testified that R.S. and the appellant had recently purchased a new console color television, cable installation, and new living room curtains and that "this amount would have added up to more than the evaluation itself." R.S. had also been ordered to attend AA meetings, which Davis testified he tried to do but could not find any that would fit into his work schedule.

Davis recommended that the child remain in his foster home with continued supervised visits. The guardian ad litem recommended that the court allow unsupervised daytime visits in the appellant's home or some public place on a trial basis. The

court agreed to unsupervised visitation on the condition that it be with the appellant only, and not with R.S. The court revised the rehabilitation plan to include a minimum of one AA meeting weekly, with a signed slip to verify attendance; participation in the domestic abuse program; and completion of a parenting class. In addition, both the appellant and R.S. were to abstain from alcohol and be subject to chemical testing at any time.

A supplemental petition to terminate parental rights was filed on June 13, 1986, and the hearing held on August 27, 1986. The testimony at the termination hearing will be discussed in conjunction with the appellant's assignments of error.

The first assignment is that the trial court erred in finding on April 6, 1983, that the child was a juvenile within the meaning of § 43-247(3)(a). The order finding that the child was a juvenile as described in the statute was an adjudication order, which was an appealable order. *In re Interest of L.D. et al.*, 224 Neb. 249, 398 N.W.2d 91 (1986); *In re Interest of V.T. and L.T.*, 220 Neb. 256, 369 N.W.2d 94 (1985). In order to appeal from that order, a notice of appeal had to be filed within 30 days from the rendition of the judgment. Neb. Rev. Stat. § 24-541.02 (Reissue 1985). In the absence of an appeal from the adjudication of April 6, 1983, the order may not be reviewed after expiration of the 30-day appeal period. *In re Interest of L.D. et al., supra; In re Interest of Aufenkamp*, 214 Neb. 297, 333 N.W.2d 681 (1983). The time in which to appeal from the adjudication expired in 1983.

The second assignment of error is that the trial court erred in finding that a clear preponderance of the evidence showed that the child was physically abused by McCracken, the live-in boyfriend. It is not clear from the December 19, 1986, termination order whether the court was merely restating the reason for the April 6, 1983, adjudication (that McCracken had abused the child) or whether it was making a new finding with regard to the termination order. If the court was restating the reason for its April 6, 1983, adjudication that the child was a child within the meaning of § 43-247(3)(a), then the issue is not reviewable for the reasons stated in regard to the first

assignment of error. If the court was making a new finding that the child had been abused by McCracken, the assignment of error must still fail because the record shows by a clear preponderance of the evidence such abuse. The appellant testified at the April 6, 1983, hearing that when the child was about 1 year old, McCracken bit him on the face hard enough to leave a bruise. The grandmother testified that "it was a pretty good size bite."

In the third and sixth assignments the appellant argues the trial court erred in finding that the evidence showed an ongoing pattern in the mother's lifestyle and an inability to protect the child from physically assaultive males, even though R.S. had been sentenced to prison. The appellant also alleges error in the court's finding that the appellant continues to depend on abusive males. At the time of the original petition, the appellant was living with Deno McCracken, who abused both her and the child. She had contact and later took the child to live with McCracken after the court had specifically warned her of the danger in which she would be placing the child. She then became involved with and married R.S., who also abused her. She testified that the abuse occurred over "[l]ittle things like not paying the rent on time or not making enough for his lunch." R.S. was diagnosed as an alcoholic, yet refused to address his problem.

At the termination hearing Dr. Ann Taylor testified that the child had a lot of fears and concerns in regard to R.S. and that those fears continued to exist. That R.S. was incarcerated subsequent to the termination hearing on first degree assault charges for a period of 5 to 12 years only suggests that the appellant may no longer be involved with R.S.; it does not suggest that she will not become involved with yet another assaultive male.

The appellant's fourth and fifth assignments of error are that the court erred in finding that numerous rehabilitation plans were not complied with by the appellant and R.S., and erred in finding that no rehabilitation plan had been substantially complied with by the appellant.

Although there are conflicts in the evidence, the testimony given at the termination hearing gives a broad overview of the

appellant's involvement with the court. It is necessary to examine the requirements of each rehabilitation plan separately to determine the appellant's level of compliance.

*First Rehabilitation Plan*—dated May 10, 1983, and incorporated into the court order of May 11, 1983.

Parenting goals:

1. Enroll in S.T.E.P. classes scheduled to begin in September 1983. The appellant did not comply. She instead took the child from her mother's home and went to Omaha to live with Deno McCracken, in flagrant violation of the court order.

2. Attend a parent support group on Tuesday mornings. The appellant testified she went "to some of them." Caseworker Connie DeBord testified that the appellant did not attend this program from December 1983 through March 1985, while DeBord was her caseworker.

3. Participate in child development courses offered through the social services department of Memorial Hospital of Dodge County. DeBord testified that the appellant failed to comply with this requirement while DeBord was her caseworker. The appellant testified that she went to two or three of the sessions but did not get anything out of them.

4. Facilitate the child's Head Start application. The appellant complied with this requirement.

5. Continue full-time parenting responsibility for the child. The appellant testified she did this. However, it was during this time (before the child was placed in foster care) that the appellant took him from her mother's home to Omaha and moved in with McCracken.

6. Attend programs on child abuse. DeBord testified there were no such programs available in Dodge County at that time.

Vocational goals:

1. Obtain her GED. The court received into evidence a letter dated May 13, 1983, which stated that the appellant had completed her GED work and requested payment from the court. It would appear the appellant had completed her GED before the rehabilitation plan, dated May 10, 1983, required it.

2. Work with CETA and vocational rehabilitation in an attempt to further her education. The appellant testified that she went to CETA and filled out an application, but did not

follow up on it.

3. Find suitable employment which would allow her to provide for herself and the child without the assistance of ADC. The appellant obtained employment at a nursing home in January 1984.

Personal goals:

1. Abstain from drug and alcohol usage and avoid associates by whom such usage is encouraged. The appellant testified that during this time she continued to drink approximately once a month but that she did not use drugs. She admitted that she associated with people by whom such usage was encouraged.

2. Develop a monthly budget. The appellant testified she had done this with caseworker Bonnie Shuman.

*Second Rehabilitation Plan*—dated February 29, 1984, and incorporated into the court order of the same date.

1. Continue employment.

2. Work toward certification as a care staff member. The appellant quit her job at the nursing home shortly after the formulation of this rehabilitation plan, thus making requirement No. 2 no longer applicable. She began working as a waitress in March 1984, but held the job for only 2 weeks. She was fired after failing to show up for work due to an arrest on April 12, 1984, for DWI, resisting arrest, possession of marijuana, driving with an expired license, and refusing to submit to a chemical test. The appellant surrendered her license for 1 year, and all charges were dismissed. The appellant remained unemployed until September 1984, when she began working at Happy Inn.

3. Attend counseling with the child's therapist as recommended. Jeannie Barmettler was the child's first therapist. Caseworker Connie DeBord testified that the appellant failed to attend a therapy session in June 1984 and that it was not until after the court hearing in August 1984 that she began to attend some of the sessions. She did not attend any more sessions after December 1984. The child's next therapist was Sue Roesch. It is not clear from the record how many times the appellant met with Roesch. The appellant did testify that she quit seeing Roesch in the beginning of 1986 because "she wouldn't give me any feedback or anything" and "she wasn't

offering any kind of help back." The child was also under the care of child psychiatrist Dr. Ann Taylor. Dr. Taylor testified that she saw the appellant approximately twice. The appellant testified that she saw Dr. Taylor three or four times, but quit going because "we didn't get along."

4. Establish an appropriate residence for herself and the child. The appellant lived with her mother until August 1984, when she married R.S. DeBord testified that the general physical condition of the residences in which the appellant lived were acceptable and that the decline in visitation was not due to the residence itself, but due to other problems. Specifically, she testified that any home in which R.S. lived would not be an acceptable home for the child. Dr. Taylor testified that the child had a lot of concerns and fears in regard to R.S. and that those fears continued to exist. The child expressed a fear of returning to his mother's home.

5. Abstain from drug and alcohol usage. The appellant was arrested on April 12, 1984, for, among other things, DWI and possession of marijuana. The appellant testified that she did keep drinking until August 1984.

6. Have no contact with Deno McCracken. The appellant testified that she had had no contact with McCracken. DeBord testified that the appellant did have contact with McCracken during a visit in the park with the child. Several men in a car drove up, at which time the appellant took the child and went over to the car. After the visitation, the child said that McCracken had been in the car.

7. The appellant had agreed to provide nutritious meals, adequate rest time, clean clothing, and necessary medical care during extended visitations with the child. DeBord testified that problems arose in regard to the child's coming home tired and upset after his overnight visits to his mother's house. She reported that the child stated that on one occasion his mother had been gone the whole night and that his grandmother took care of him. There were also allegations made that the appellant and her mother had been taking baths with the child. The appellant denied taking a bath with her son, but admitted that her mother had done so. It was at this time that DeBord and the foster parents became concerned about some sexual acting-out

behavior that the child displayed at the foster home after returning from visitations. On one occasion the child began touching and playing with his foster brother's buttocks and placed his finger into the foster brother's anus. Because of this and the appellant's arrest for DWI, the overnight visitations were discontinued.

*Third Rehabilitation Plan*—dated June 24, 1985, and incorporated into the court order of July 31, 1985.

1. Continue employment. The appellant continued to work at the Happy Inn until September 1985, and then went to work at Hinky Dinky. She quit working at Hinky Dinky in March 1986, and went back to work at the Happy Inn. She was fired from the Happy Inn in August 1986, and as of the time of the termination hearing was not employed.

2. Attend counseling with the child's therapist as recommended. As previously discussed under the second rehabilitation plan, the appellant did not comply.

3. Continue to keep a residence appropriate for herself and the child. The appellant continued to live with R.S. The appellant testified she had continued to live with him even though, in the course of the past 2 years, social services, Dr. Taylor, and her own attorneys told her that R.S. was a large obstacle to her regaining custody of the child. In December 1985, the child told Dr. Taylor that his mother had hit him with a closed fist on the top of his head and had left bruises.

4. Abstain from drug and alcohol usage and submit to alcohol or drug testing if required by law enforcement or social services. In April 1986, social services requested a drug testing of the appellant after a family support worker visiting the home reported that she thought she had smelled marijuana and that the appellant appeared somewhat incoherent. The test results indicated the appellant had used marijuana. The appellant admitted that she had smoked marijuana as recently as August 4, 1986. At the time of the hearing the appellant was incarcerated in the Dodge County jail on charges of conspiracy and delivery of a controlled substance. R.S. was charged with the same offenses, plus an assault charge. Detective Sergeant Tellatin of the Fremont Police Department testified that on August 22, 1986 (5 days prior to the hearing), in a search of the

appellant's residence, marijuana was seized; two bongs, estimated to have been used within a fairly short period of time, and a small pipe were also found. He also testified that there was evidence that alcohol had been consumed in the house, as indicated by empty beer cans and an empty whiskey bottle. The appellant denied having consumed any alcohol since August 1984 and said that the empty cans and bottle belonged to someone else.

5. Regularly attend AA meetings. Sharon Davis, who became the appellant's caseworker in March 1985, stated the only evidence she had that the appellant was attending AA meetings was some attendance slips signed by appellant's friend Donna Hansen. She asked the appellant from then on to have the designated person that normally confirms attendance at AA meetings sign her attendance slips. Davis never received any attendance slips after that. The appellant testified that she tried to go on Sunday nights "if I didn't have laundry or something to do . . . ."

6. Become involved in a domestic abuse program. The appellant became involved in the S.O.S. (Systems of Support) program in late 1985, for a period of 2½ to 3 months. She told Davis that the group had stopped meeting for a time and when they resumed she did not join the new group. The appellant testified that she was not involved in any domestic abuse program at the time of the termination hearing, but had signed up to begin one the following month.

7. Attend a parenting class. The appellant did attend the S.T.E.P. course and successfully completed it.

The record shows that over a period of 3 years the appellant has demonstrated her unwillingness to substantially comply with the requirements of her rehabilitation plans. As this court has stated:

"As all too frequently occurs in cases such as the one before us, the enthusiasm or receptivity of a parent toward a rehabilitation program seems to intensify as the time for a dispositional hearing approaches. A practical program of parental rehabilitation should not be viewed as our system's indulgent toleration of an otherwise intolerable situation. A parent afforded a program of rehabilitation

must realize that the courts will examine a pattern of parental conduct in determining an appropriate disposition for the best interests of the child. In cases such as this the past is an indication of the future."

*In re Interest of J. W.*, 224 Neb. 897, 903, 402 N.W.2d 671, 675 (1987), quoting from *In re Interest of D.*, 218 Neb. 23, 352 N.W.2d 566 (1984).

The appellant's attendance at recent parenting and support groups is laudable, but it is too little, too late. She was ordered to begin those classes in September 1983. The above review of her compliance with the rehabilitation plans shows a definite and distinct unwillingness to comply with the plans, which were formulated for the purpose of changing the conditions in her home and life so as to allow her to regain custody of her son.

The sixth assignment of error is that the court erred in finding that the appellant has continued to abuse drugs.

The appellant has been arrested twice on alcohol- and drug-related charges since the trial court took jurisdiction of the case. Her first arrest was on April 12, 1984, for DWI, resisting arrest, possession of marijuana, driving with an expired license, and refusing to submit to a chemical test. While the exact connection between the two is not clear from the record, it appears that the charges were dismissed after the appellant surrendered her driver's license for 1 year. During April of 1986 she was required by social services to submit to a drug test after a caseworker smelled what she thought to be marijuana in the appellant's home. The test results indicated that the appellant had recently smoked marijuana.

In August 1986, she was arrested for conspiracy and delivery of a controlled substance. Evidence was received by the court subsequent to the termination hearing indicating that these charges had been dismissed. The appellant admitted that she had used marijuana as recently as August 4, 1986. The court did not err in finding that the appellant continued to abuse drugs.

The seventh and eighth assignments of error allege that the court erred in finding that conditions existed for the termination of parental rights as provided in § 43-292. The court found that under § 43-292 termination of parental rights would be in the best interests of the child, and following the

determination that the child was a juvenile within the meaning of § 43-247(3)(a), reasonable efforts, under the direction of the court, had failed to correct the conditions leading to that determination.

"In an appeal from a judgment terminating parental rights, the Supreme Court tries factual questions de novo on the record, which requires the Supreme Court to reach a conclusion independent of the findings of the trial court, but, where evidence is in conflict, the Supreme Court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts rather than another. . . ."

*In re Interest of C.C., ante* p. 263, 264, 411 N.W.2d 51, 53 (1987); *In re Interest of K.L.N. and M.J.N.*, 225 Neb. 595, 407 N.W.2d 189 (1987).

An order terminating parental rights must be supported by clear and convincing evidence and should only be issued as a last resort when no other alternative exists. However, the primary consideration in a termination proceeding is the best interests of the child. *In re Interest of K.L.N. and M.J.N., supra; In re Interest of M.B., R.P., and J.P.*, 222 Neb. 757, 386 N.W.2d 877 (1986). This standard means that the ultimate decision of the court, after sufficient evidence has been presented, must be rendered in the best interests of the child. *In re Interest of M.B., R.P., and J.P., supra.*

Dr. Ann Taylor testified that the child is a very bright but anxious child who worries a lot, and because of this, stability is very important for him. When he is uncertain or unclear about things, he becomes extremely anxious and gets overwhelmed with his feelings, and cannot handle things until he knows clearly what will be happening to him. Because of this anxiety, a stable environment is very important to him. Dr. Taylor further testified that the child requires an environment that is structured, consistent, and predictable. His anxiety is in part due to his high level of intelligence, which was tested and showed an IQ of 136, putting him in the 99th percentile intellectually. Because of his intelligence, Dr. Taylor testified, "He's more aware of what is going to happen to him if things are not handled correctly . . . ."

Since she began seeing the child, Dr. Taylor has noted an

improvement in his verbalization of feelings, a better ability to express his anxieties, much improved motor skills, and an improvement in his overall functioning. She noted that as long as the child is in a stable environment where he feels safe, his school tasks are adequately attended to, and his needs are adequately met, he can become a very functional adult. Dr. Taylor testified that as to his need for stability, it would be in his best interests to terminate parental rights. The evidence supports a finding that termination of the appellant's parental rights is in the child's best interests.

The appellant also alleges error in the trial court's finding that, under § 43-292(6), reasonable efforts had failed to correct the conditions leading to the determination that the child was a juvenile within the meaning of § 43-247. At the time of the termination hearing, the appellant was unemployed, in jail, living with a man who beat her, showed no sign of discontinuing drug use over the 3 years, and showed little effort to cooperate with the child's therapists. When a parent fails to rehabilitate herself within a reasonable time, the best interests of the child require that a final disposition be made without delay. *In re Interest of J. W.,* 224 Neb. 897, 402 N.W.2d 671 (1987); *In re Interest of A.L.N.,* 223 Neb. 675, 392 N.W.2d 780 (1986). As this court has often stated, a child cannot, and should not, be suspended in foster care, nor be made to await uncertain parental maturity. *In re Interest of R.A., ante* p. 160, 410 N.W.2d 110 (1987); *In re Interest of K.L.N. and M.J.N., supra; In re Interest of D.,* 218 Neb. 23, 352 N.W.2d 566 (1984).

The evidence supporting the termination is clear and convincing, and the judgment should be affirmed.

The appellant's ninth assignment of error is that the lower court committed error throughout the proceedings in the reception of evidence, which deprived the appellant of a fair trial. Nowhere in appellant's brief is this issue discussed. Consideration of an issue in this court is limited to errors assigned and discussed. Neb. Ct. R. of Prac. 9D(1)d (rev. 1986); *Beatty v. Davis,* 224 Neb. 663, 400 N.W.2d 850 (1987); *Fee v. Fee,* 223 Neb. 128, 388 N.W.2d 122 (1986).

The judgment is affirmed.

AFFIRMED.