IN RE INTEREST OF K.C. AND C.C., CHILDREN UNDER 18 YEARS OF
AGE.
STATE OF NEBRASKA, APPELLEE, V. A.H., APPELLANT.
416 N.W.2d 24

Filed December 4, 1987.   No. 87-157.

Jerry J. Milner, for appellant.

John R. Brownell, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN,
and GRANT, JJ., and COLWELL, D.J., Retired.

HASTINGS, C.J.

This is an appeal from the judgment of the county court for
Hall County, sitting as a juvenile court, which had terminated
the parental rights of A.H. to her daughter, K.C., born June 21,
1982, and her son, C.C., born February 4, 1981. We affirm.

The custody rights of the natural father are not involved in
this appeal. The errors assigned by the mother are: (1) The court
erred in finding that there was clear and convincing evidence
that parental rights should be terminated; (2) the rehabilitation
plan ordered by the court was not reasonable; and (3) the court
erred in allowing exhibits 2 and 21 into evidence.

The mother and her boyfriend began living together, along
with the two minor children, in September of 1984. The

daughter, K.C., was admitted to the hospital on May 5, 1985, with a fractured femur. Additionally, examination of her revealed several very fresh abrasions on her cheeks and chin and some moderate bruises over bony prominences of the cheeks, a shallow laceration of the upper gingiva over both central incisors, a moderately old bruise on the lower right leg, and nearly healed fracture sites at the left 9th and 10th ribs. The mother reported that she did not see the child fall, in the bathroom, and explained the lacerations and bruises as having occurred when the child fell down some steps and from having been pushed into a fence by her brother. Additionally, there was a "mouse" under one eye and two circular burns, which the mother said occurred when the child ran into the mother's hand which was then holding a cigarette. (The "mouse," she said, was caused when the mother's boyfriend tossed a doll to the child.)

During various interviews while in foster care, where they yet remain, the children have described being hit, punched, and "flushed down the toilet." The minor boy commented as late as September 23, 1986, that "we wanna go back (to mother), but we can't . . . 'cause [the boyfriend is] still there, and we don't want him to beat us." Both children stated that they love their mother and would like to live with her, but consistently stated they will not go home if the boyfriend remains there. Neither child appeared to feel reassured that the mother's friend would not be present and/or that they would be protected from him, according to the reports of the welfare workers.

The evidence is uncontroverted that the boyfriend was charged with a felony count of child abuse involving the minor girl, eventually pleaded guilty to the amended charge of misdemeanor child abuse, and was sentenced to 1 year in the Hall County jail.

The boyfriend described the incident in which the little girl's leg was broken as an accident; that he was in the bathroom when she came in to use the potty chair and that he went out and then heard a thump, went back into the bathroom, and found her on the floor. He claimed not to have known anything about the cigarette burns to the little girl until he heard the testimony during these proceedings, in spite of the fact that the mother

had testified that he was out in the yard with them when the incident occurred. Although the mother had indicated that the boyfriend on occasions had swatted the kids in the rear end, he said that was not for discipline purposes, but was just "little [wrestling] matches on the floor." The boyfriend admitted he pleaded guilty to child abuse. However, he described the incident as one at a particular time when he "was a little tested or hot or something" and the minor girl was lying on the bed and could not move and wanted her doll, so he started tossing stuff, dolls, over his head, behind his head, and one of them struck her right below the eye. "I'll admit to that," he said.

The boyfriend testified that since getting out of jail, he is still living with the mother. He says he is going to continue living at the address where the mother lives, and he feels that "we want to live together, and have the children back home."

The mother agrees that she and the boyfriend are still living together. She is vague as to how long this living arrangement will continue; she has stated that she has plans to marry him, yet at other times she has stated that marriage was only "[w]ishful thinking." She feels that her future with her boyfriend is uncertain at this time, but admits that she is currently financially dependent on him.

For a long time the mother steadfastly denied that there was any abuse of her children by the boyfriend. However, she admitted that on one visitation her son had asked her why she had let the boyfriend beat and punch on him and stood there and watched him. She said that the foster mother had put the boy up to saying that. However, she did finally admit that her children might be telling the truth that the boyfriend had inflicted injuries on them, and that their fear might be justified.

On June 4, 1985, a juvenile petition was filed, alleging that the children were in a situation dangerous to their health through no fault of the custodial parent. At a hearing held on June 27, custody of the children was placed with the Department of Social Services (DSS), they were placed in a temporary foster home at the time, and later, in October, were moved to a second home, where they still remain.

On August 8, 1985, the mother admitted the truth of the allegations in the petition and was ordered to comply with the

terms of an agreement formed by her, her boyfriend, and DSS. Among other things, the agreement called for her to undergo a psychological evaluation, to attend parenting classes, to seek employment, to continue weekly visitations with the children, and to participate in counseling as recommended. Furthermore, the boyfriend was ordered to have no contact with the children.

At a dispositional hearing held on February 19, 1986, the mother was again ordered to comply with the requirements of the August agreement. In particular, she was ordered to participate and cooperate in a psychological evaluation; to participate and cooperate in an alcohol/drug evaluation and comply with the recommendations of the evaluator; to show a consistent record of weekly, punctual visits with the children; to seek full-time employment; to provide DSS with monthly financial records; and to obtain suitable housing for herself and her children. The court further ordered that no other adults, except relatives of the children, were to be permitted to reside in such housing.

Shortly after this hearing, the boyfriend pled guilty to Class I misdemeanor child abuse. On April 21, 1986, the mother and the boyfriend moved to a new address, a one-bedroom residence at 516 North Wheeler. On May 2, the boyfriend went to jail to begin serving his sentence for his child abuse conviction. However, on November 5, 1986, he injured his back and was released from jail to convalesce at the mother's home, where he was still residing at the time of the hearing.

On July 17, 1986, the county attorney moved for an order terminating the parental rights of the mother, alleging that she had failed to correct the conditions leading to the determination that the children were as described in Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1984).

The hearing on the motion to terminate parental rights was held on October 14 and November 18, 1986, and was completed on January 8, 1987. Evidence was adduced regarding the extent of the appellant's compliance with the rehabilitation program devised for her.

The record reflects that although the rehabilitation program provided for weekly visitation, the mother was late or absent on

several occasions. Specifically, the appellant failed to show for visitations on August 28, October 10, November 7, December 12, and December 26, 1985, and January 23, October 23, November 6, and November 11, 1986. She was also 40 minutes late on September 26, 1985, 15 minutes late on October 17, 1985, 20 minutes late on October 24, 1985, 45 minutes late on October 31, 1985, and 20 minutes late on September 4, 1986.

The mother was also ordered to undergo a psychological evaluation. Although she attended one session with the psychologist, Dr. England, on September 13, 1985, she failed to show up for additional appointments scheduled for September 23, November 1, and December 17, 1985, and January 24, 1986. She attended a second session with Dr. England on May 27, 1986, more than 8 months after the first session. Because the doctor felt that scheduling additional appointments would not be beneficial in light of the appellant's attendance record, he notified the appellant that further sessions would not be necessary. The mother described these sessions as unnecessary and "silly."

In October and November of 1985, she did attend and complete parenting classes at the YWCA, as required by the court.

In addition, the mother obtained part-time employment at the CJR restaurant in December 1985. In May 1986 she quit the job at CJR because of a conflict with her boss, and in the summer of 1986 she found employment at Village Inn as a waitress. In approximately December 1986, she left Village Inn to begin employment at Wheeler's. She has submitted financial records to DSS as requested.

The court also ordered the mother to comply with the recommendations given by the counselor after a drug/alcohol evaluation. The mother did not schedule an evaluation until July 31, 1986. She failed to show up for this appointment. On September 3, 1986, she did submit to the evaluation, at which time the counselor recommended inpatient treatment for a codependency problem. Briefly, the counselor explained that the mother was "extremely dependent and pre-occupied with another person"—in this case the boyfriend—and that inpatient treatment would be the only effective remedy. The

mother refused inpatient treatment, in part because she did not agree that she had a problem necessitating treatment, and in part because she felt that undergoing inpatient treatment could cause her to lose her job.

The State filed a motion to terminate parental rights on July 17, 1986. The mother was represented by counsel at all stages of the proceedings. The children also had court-appointed counsel. The evidentiary hearings were held on October 14 and November 18, 1986, and January 8, 1987, at which the evidence covering the foregoing facts was set forth.

By order filed on January 26, the court ordered termination of parental rights. The court found that although the mother had minimally complied with certain requirements imposed upon her by the court, her failure to substantially comply constituted substantial neglect of the children. More specifically, the court determined that the mother had elected to maintain her relationship with the boyfriend to the detriment of being able to provide a safe and proper atmosphere for the minor children.

An order terminating parental rights must be supported by clear and convincing evidence, *In re Interest of C. W.*, 226 Neb. 719, 414 N.W.2d 277 (1987), and should be issued only as a last resort when no other alternative exists. Such an order will be reviewed by this court de novo on the record, which requires the court to reach a conclusion independent of the findings of the trial court, but this court may give weight to the findings of the trier of fact, the juvenile court, because that court heard and observed the witnesses and accepted one version of the facts rather than the other. *In re Interest of Z.R.*, 226 Neb. 770, 415 N.W.2d 128 (1987).

Although the mother's attitude and actions showed some ambivalence, it comes across quite clearly that she was not truly devoted to a choice favoring the welfare of her children as opposed to a continuing relationship with her boyfriend. It is quite apparent that the boyfriend's presence in the household poses a real and present risk to the safety of the children.

We have quite consistently held that a parent's failure to take proper measures to protect the children from abuse by another furnishes sufficient cause to terminate parental rights. See, *In*

*re Interest of Hollenbeck*, 212 Neb. 253, 322 N.W.2d 635 (1982); *In re Interest of Carlson*, 207 Neb. 540, 299 N.W.2d 760 (1980); *In re Interest of Goodon*, 208 Neb. 256, 303 N.W.2d 278 (1981). Children have a right to grow up in a wholesome and healthful atmosphere, free of fear of abuse or injury. *In re Interest of Carlson, supra.* There is insufficient evidence in the record to convince us that the mother's living habits or arrangements are likely to change.

The juvenile court could not place the children with the mother in view of her conduct with and attitude toward her boyfriend and in view of her continuing relationship with him, and indefinite foster care is unacceptable. The court had no alternative but termination, as the mother was unwilling to make a clear choice of her children over her boyfriend. *In re Interest of J. and R.*, 216 Neb. 183, 342 N.W.2d 660 (1984).

The rehabilitation plan as to living arrangements, if nothing else, was reasonable. The evidence found in the record, without regard to exhibits 2 and 21, was sufficient to support a clear and convincing finding that the trial court acted in the children's best interests, and therefore we need not discuss that assignment of error.

The judgment is affirmed.

AFFIRMED.